Lisa SIMPSON, and Anne Gilmore, Plaintiffs,

v.

UNIVERSITY OF COLORADO, Boulder, through its Board, the Regents of the University of Colorado, a body corporate, Defendants.

No. 02–RB–2495 CBS.

United States District Court, D. Colorado.

March 31, 2005.

Michael W. Schreiner, University of Colorado, Boulder, CA, Kay J. Rice, Cooper & Clough, PC, Denver, CO, Larry S. Pozner, Hoffman, Reilly, Pozner & Williamson, L.L.P., Denver, CO, Stephen S. Dunham, Morrison & Foerster, LLP, Denver, CO, for University of Colorado at Boulder.

Marc David Flink, Benjamin D. Pergament, Baker & Hostetler, Denver, CO, for Denver Pub. Co.

Christopher Wallace Ford, Kimberly M. Hult, Hutchinson, Black and Cook, LLC, Boulder, CO, for Lisa Simpson.

Seth J. Benezra, John A. Culver, Benezra & Culver, LLC, Lakewood, CO, for Anne Gilmore.

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

BLACKBURN, District Judge.

This matter is before me on the defendant University of Colorado's Motion for Summary Judgment [# 219], filed May 5, 2004. I grant the motion.[1]

### I. JURISDICTION

This case arises under 20 U.S.C. § 1681(a), part of Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681—1688. I have federal question jurisdiction under 28 U.S.C. § 1331.

### II. STANDARD OF REVIEW

The purpose of a summary judgment motion is to assess whether trial is necessary. *White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir.1995). FED. R. CIV. P. 56(c) provides that the court may grant summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Concrete Works, Inc. v. City & County of Denver*, 36 F.3d 1513, 1517 (10th Cir.1994). Summary judgment may be granted if the court concludes that no "rational trier of fact" could find for the nonmoving party based on the showing made in the motion and response. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The moving party bears the initial burden of showing an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works, Inc.*, 36 F.3d at 1518 (citing *Celotex Corp.*, 477 U.S. at 325, 106 S.Ct. 2548). The nonmoving party may not rest solely on the allegations in his or her pleadings, but must instead designate "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. 2548. The factual record must be viewed in the light most favorable to the nonmoving party. *Concrete Works, Inc.*, 36 F.3d at 1517 (citing *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir.1990)). However, evidence that is merely colorable or not significantly probative is inadequate to withstand a summary judgment motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Redmon v. United States*, 934 F.2d 1151, 1155 (10th Cir.1991). Immaterial factual disputes will not defeat a motion for summary judgment. *Palermo v. First Nat'l Bank & Trust Co.*, 894 F.2d at 366–67; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### III. FACTS

The plaintiffs, Lisa Simpson and Anne Gilmore, allege that they were sexually assaulted at a party attended by University of Colorado (CU) football players and recruits. At the time, both Ms. Simpson

---

1. The issues raised by and inherent to the motion for summary judgment are fully briefed, obviating the necessity for evidentiary hearing or oral argument. Thus, the motion stands submitted on the papers. *Cf.* FED. R. CIV. P. 56(c) and (d). *Geear v. Boulder Cmty. Hosp.*, 844 F.2d 764, 766 (10th Cir.1988) (holding that hearing requirement for summary judgment motions is satisfied by court's review of documents submitted by parties).

and Ms. Gilmore were CU students. The party and the alleged assaults took place on December 7, 2001. For the purpose of the motion for summary judgment, the facts of the alleged sexual assaults are not disputed. The plaintiffs allege that a CU football player (player # 1) and a female CU student who had been an athletic department tutor (the tutor) devised a plan for a football recruiting event to occur on Friday night, December 7, 2001. They allegedly planned to provide the recruits with an opportunity to have sex with intoxicated female CU students. The tutor knew that several female students planned that night to spend a "girls' night in" playing drinking games at Ms. Simpson's apartment.

The tutor arrived at Ms. Simpson's apartment around 8:45 to 9:00 p.m. The plaintiffs had been drinking earlier, and continued to drink after the tutor's arrival. At some point, the tutor told Ms. Simpson that two CU football players and their two recruits might stop by the apartment.

At approximately 11:30 to 11:45 p.m., about 16 to 20 CU football players and recruits poured into Ms. Simpson's apartment. Many of the players and recruits had been drinking and smoking marijuana. Some of the players and recruits continued to consume alcohol at Ms. Simpson's apartment. About 30 minutes later, some of the players and recruits decided to leave the apartment.

Player # 2, who was preparing to leave, was approached by the tutor. The tutor told him that he should not leave because "it was about to go down." Player # 2 understood her comment to mean that female students soon would provide sexual favors to the players and recruits.

At about this time, Ms. Simpson felt very intoxicated and tired and went to her bedroom. She lay down on the bed and fell asleep. Ms. Simpson later awoke to find two recruits removing her clothes.

She was sexually assaulted by the recruits as players surrounded the bed. Subsequently, several CU football players also demanded sexual favors from Ms. Simpson. Ms. Simpson attempted to resist, but was unable to resist or leave because she was terrified and surrounded by at least five large football players and recruits.

While Ms. Simpson was being assaulted, Ms. Gilmore was being sexually assaulted in the same room by player # 2, another football player, and a third man who was either a player or a recruit. Ms. Gilmore says she was too intoxicated to voluntarily and consensually participate in the sexual contact.

The plaintiffs allege that a variety of incidents that occurred prior to December 7, 2001, indicated that the practices of the CU Athletic Department and football program had created a known risk of sexual harassment, sexual assaults, and sexual discrimination against female students and other women by football players and recruits. *Simpson First Amended Complaint*, ¶ 73; *Gilmore First Amended Complaint*, ¶ 70. They allege that the assaults they suffered on December 7, 2001, "are part of the sexual harassment and assaults of which CU had actual knowledge and to which it was deliberately indifferent." *Id.*

Finally, I note that the plaintiffs frequently cite the Final Report of the Independent Investigative Commission Examining the University of Colorado's Athletic Recruitment Practices, dated May 14, 2004. *Simpson response*, Exhibit 1; *Gilmore Response*, Exhibit 2 (*IIC Report*). The parties refer to the Commission as the IIC. The University's Board of Regents created the Independent Investigative Commission to investigate issues involving sexual misconduct, alcohol abuse, and substance abuse, including "the question of

whether sex and alcohol are used as recruiting tools in the football recruiting program." *IIC Report*, p. 1. Ms. Gilmore argues that the IIC's findings are admissible as non-hearsay under Fed.R.Evid. 801(d)(2), or as a hearsay exception under Fed.R.Evid. 803(8). The record does not contain sufficient information for me to determine if the foundational predicates for admission under these rules have been satisfied. For example, the nature and scope of any duty of the commission to make a statement, or the commission's authorization to make statements on behalf of the University, is not detailed in the record. To the extent I refer to the IIC Report, I assume, without deciding, that the plaintiffs' evidential hypothesis is correct.

## IV.  LEGAL BACKGROUND

■ The plaintiffs claim that the sexual assaults they suffered on December 7, 2001, constitute actionable sexual harassment and sexual assault under Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681—1688. Section 1681(a) provides:

> [n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

Title IX defendants sometimes are referred to as "recipients" or "funding recipients" because their liability is based on their receipt of federal funds. The government's Title IX enforcement power may be exercised only against a funding recipient, and liability for damages in a private suit under Title IX is limited to funding recipients. *Davis as Next Friend LaShonda D. v. Monroe County Bd. of Educ.*, 526 U.S. 629, 641, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999). It is undisputed that the University of Colorado receives federal financial assistance, and is, thus, a funding recipient.

In *Davis*, the Supreme Court held that a school district that receives federal funding may be liable for subjecting its students to discrimination when the school district is deliberately indifferent to known acts of student-on-student sexual harassment and the harasser is under the school's disciplinary authority. *Id.* at 646–47, 119 S.Ct. 1661. A district is liable in damages only when its deliberate indifference effectively caused the discrimination. *Id.* at 642–43, 119 S.Ct. 1661 (quoting *Gebser v. Lago Vista Indep. School Dist.*, 524 U.S. 274, 291, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998)). The Supreme Court adopted this high standard in *Gebser* to eliminate any "risk that the recipient would be liable in damages not for its own official decision but instead for its employees' independent actions." *Id.* at 643, 119 S.Ct. 1661 (quoting *Gebser*, 524 U.S. at 290–91, 118 S.Ct. 1989). The Court held in *Davis* that the same standard applies to claims involving student-on-student harassment. *Id.* at 646–47, 119 S.Ct. 1661.

> [A Title IX] recipient's damages liability [is limited] to circumstances wherein the recipient exercises substantial control over both the harasser and the context in which the known harassment occurs. Only then can the recipient be said to "expose" its students to harassment or "cause" them to undergo it "under" the recipient's programs.

*Id.* at 645, 119 S.Ct. 1661.

■ A recipient will be deemed deliberately indifferent to acts of student-on-student harassment only when the recipient's response to the harassment is "clearly unreasonable in light of the known circumstances." *Id.* at 648, 119 S.Ct. 1661. In other words, when a recipient knows of acts of harassment, and, thus, is aware of a substantial risk of student-on-student

harassment, the recipient must exercise means of control available to it to control or eliminate the risk. If the recipient fails to exercise available means of control, or exercises those means in a way that is "clearly unreasonable," then the recipient can be seen as having been deliberately indifferent to the risk. Under these circumstances, the recipient can be seen as having made an official decision to permit the risk to continue. Title IX damages liability can be based only on such an official decision.

The United States Court of Appeals for the Tenth Circuit applied *Davis* in *Murrell v. School District No. 1, Denver, Colorado,* 186 F.3d 1238 (10th Cir.1999). In *Murrell,* the court considered a plaintiff's claim that a high school principal, and other school officials, had refused to take any action to control one student's extreme sexual harassment of another student, despite the school officials' knowledge of the extreme sexual harassment. The court noted that "*Davis* imposes liability only if the district remains deliberately indifferent to acts of harassment of which it has actual knowledge." *Id.* at 1246 (citing *Davis,* 119 S.Ct. at 1672). The *Murrell* court outlined the four factors that must be proven to establish a Title IX claim based on sexual harassment:

> [A] plaintiff must allege four factors to state a claim of school district liability under Title IX. She must allege that the district (1) had actual knowledge of, and (2) was deliberately indifferent to (3) harassment that was so severe, pervasive and objectively offensive that it (4) deprived the victim of access to the educational benefits or opportunities provided by the school. This limited rule imposes liability only on those school districts that choose to ignore Title IX's

mandate for equal educational opportunities.

*Id.* at 1246 (citing *Davis,* 119 S.Ct. at 1671–72). The *Murrell* court concluded that Title IX liability may arise only when a school official who has actual knowledge of the abuse is invested with the duty to supervise the harasser and has the power to take action that would end the abuse. *Id.* at 1247.

The parties disagree on the wording of the elements of a Title IX claim in the context of this case. Based on *Davis* and *Murrell,* I conclude that the plaintiffs must allege and prove by a preponderance of the evidence the following five essential elements to establish their Title IX claim:

1. that the University had actual knowledge of sexual harassment of female CU students by football players and recruits as a part of the football recruiting program;

2. that the University was deliberately indifferent to this known sexual harassment of female CU students by football players and recruits as a part of the football recruiting program;

3. that the plaintiffs were subjected to severe, pervasive and objectively offensive sexual harassment caused by the University's deliberate indifference to known sexual harassment;[2]

4. that the harassment occurred in the context of an educational activity; and

5. that the harassment had the systemic effect of depriving plaintiff of access to educational benefits or opportunities.

There is no dispute that the sexual assaults described by the plaintiffs constitute severe and objectively offensive sexual harassment. However, I conclude that, viewing the facts in the record in the light

---

**2.** This element subsumes the requirements that the defendant school have sufficient control over both the harasser and the context in which the known harassment occurs. *Davis,* 526 U.S. at 645, 119 S.Ct. 1661.

most favorable to the plaintiffs, no rational trier of fact could conclude that the plaintiffs have established the first and second elements listed above. Absent such proof, the plaintiffs cannot establish the causal connection required under the third element. Absent adequate proof of each essential element, the University is entitled to the entry of judgment as a matter of law.

## V. WHETHER THE UNIVERSITY HAD ACTUAL KNOWLEDGE OF THE RELEVANT RISK

■ In their complaints, the plaintiffs allege that the University

had actual knowledge of and has been deliberately indifferent to known sexual harassment, sexual assaults and sexual discrimination against female students and other women caused by the practices of CU's Athletic Department and football program.

*Gilmore complaint,* ¶ 70, *Simpson complaint,* ¶ 73. Under the *Davis* standard, the University can not be deliberately indifferent to a risk of sexual harassment or sexual assault if the University did not have adequate notice of the risk. In *Murrell,* the Tenth Circuit read *Davis* to "require that a school official who possessed the requisite control over the situation had actual knowledge of, and was deliberately indifferent to, the alleged harassment." 186 F.3d at 1247. "[F]ailure to prevent sexual harassment by a student *before it occurs* does not violate Title IX ... absent a showing of an institutional policy of indifference." *Id.* at 1251 n. 7 (emphasis in original).

### A. University Officials with Requisite Control

■ Viewing the facts in the record in the light most favorable to the plaintiffs, I conclude that the head coach of the CU football team, Gary Barnett, generally had control over the rules established for the football program, and control over the enforcement of those rules within the football program. In addition, I conclude that officials higher in the chain of command, such as Athletic Director Richard Tharp and University Chancellor Richard Byyny, also had such control. Because these officials had the requisite control over the football program, their knowledge of the alleged risk is a critical consideration in determining the University's Title IX liability.

Generally, the plaintiffs claim that Barnett had notice of the various events that, the plaintiffs claim, demonstrate that the CU football program presented a risk of sexual harassment and sexual assault against female CU students. The plaintiffs allege also that officials higher in the chain of command, such as Tharp and Byyny, also had notice of certain relevant events.

### B. Scope of Risk at Issue

The University argues that the plaintiffs must show that the University knew of a risk of sexual harassment from a particular harasser who subsequently harassed the plaintiffs. The Title IX cases cited by the parties that involve student-on-student sexual harassment all involve harassment undertaken by a particular individual known to the defendant school or school district. In such circumstances, both the risk and the potential remedies are focused on one individual. The University argues that the plaintiffs improperly attempt to expand Title IX liability to cover a more general, less focused risk; a risk allegedly presented by many or all of the players and recruits involved in the CU football recruiting program. This expansion, the University argues, is unwarranted by Title IX case law.

The plaintiffs argue that previous incidents of sexual harassment and sexual assaults by participants in the football re-

cruiting program, and by participants in the football program in general, put the University on notice that female University students faced a risk of severe and pervasive sexual harassment and sexual assault from participants in the football program. The particular risk cited by the plaintiffs is the risk that football players and recruits would sexually assault female University students as part of the recruiting program, and that those assaults would be aided by excessive alcohol use by players, recruits, and female students.

The plaintiffs cite *Bryant v. Independent School Dist. No. I–38 of Garvin County, OK,* 334 F.3d 928 (10th Cir.2003), as authority for the proposition that a risk of harassment by a group of students, as opposed to a particular student, may be the basis of Title IX liability. *Bryant* involved a claim of race discrimination under Title VI, 42 U.S.C. § 2000d. The *Bryant* court found that Title VI is the race analog to Title IX's sex discrimination protections, and concluded that the standards outlined in *Davis* were applicable to the Title VI claim at issue in *Bryant. Id.* at 934.

In *Bryant,* the plaintiffs alleged that school officials had allowed the presence of

> offensive racial slurs, epithets, swastikas, and the letters "KKK" inscribed in school furniture and in notes placed in African American students' lockers and notebooks. Additionally, [the plaintiffs] claim that Caucasian males were allowed to wear T-shirts adorned with the confederate flag in violation of the dress code prohibiting offensive and disruptive clothing. Appellants further claim that, even though the School was aware of the hostile environment because of complaints by students and parents, it did nothing to remedy the situation ....

*Id.* at 931. Reviewing the district court's decision to grant the defendant's motion to dismiss, the *Bryant* court said

> ... we are holding that when administrators who have a duty to provide a nondiscriminatory educational environment for their charges are made aware of egregious forms of intentional discrimination and make the intentional choice to sit by and do nothing, they can be held liable under [Title VI]. Students and parents complained to the teachers and the principal at the School regarding shameful student-to-student conduct which, if proven, could be fairly characterized as racist and prejudicial. The school administrators did not necessarily create the hostile environment. However, from the facts as alleged in the record, it appears that they might have facilitated the hostile environment or, in the least, permitted it to continue.

*Id.* at 933 (internal quotation to the record omitted). In her concurrence in *Bryant,* Chief Judge Tacha emphasized that "*Davis* painstakingly limits the range of facts that, if proved, will support a finding of liability and an award of damages under this theory." *Id.* at 935. "[T]he compass of facts supporting liability under the deliberate indifference theory is narrow and heavily qualified." *Id.* at 938.

Applying *Davis,* as interpreted in *Bryant,* I conclude that Title IX liability can be based on a risk presented by a group of harassers. In this context, however, I conclude that the risk at issue must remain focused. One of the key points emphasized in *Davis* is that Title IX liability is closely circumscribed. The more a risk becomes generalized, the more that risk is likely to fall outside of the narrowly circumscribed scope of Title IX liability. In other words, the risk at issue must be well-defined and focused to support a claim of Title IX liability.

The *Bryant* plaintiffs alleged that the racially hostile acts of some students, specifically described in their complaint, de-

prived them of access to educational benefits or opportunities. In this case, the plaintiffs claim that the sexual assaults they suffered at an event orchestrated by the football recruiting program deprived them of access to educational benefits or opportunities. I conclude that the relevant risk in this case is the particular risk cited by the plaintiffs: the risk that football players and recruits would sexually assault female University students as part of the recruiting program, including the risk that those assaults would be aided or exacerbated by excessive alcohol use by players, recruits, and female students. In the context of the record in this case, a risk defined more broadly would fall outside of the narrowly circumscribed purview of liability under Title IX.

Further, I note that the plaintiffs allege that they faced a risk presented by both players and recruits, that the University had control over both players and recruits, but failed to exercise this control to eliminate the risk. Much of the plaintiffs' argument concerning the University's alleged deliberate indifference concerns the University's failure to implement rules and exercise supervision concerning the recruiting program. The scope of the University's control, as described by the plaintiffs, informs the scope of the risk that is relevant to a Title IX analysis.

Finally, it is important to note that Title IX liability is limited to sexual harassment that deprives a CU student of access to educational benefits or opportunities. *Murrell,* 186 F.3d at 1246. Harassment of non-students does not deprive a CU student of access to educational benefits or opportunities. In the context of this case, sexual harassment of non-students is relevant to the issue of notice only to the extent such harassment provides notice to University officials that CU students face a risk of sexual harassment or sexual assault.

## C. Events Alleged to Have Provided Notice

The plaintiffs cite several events that preceded their alleged assaults which, they argue, are sufficient to demonstrate that University officials were on notice of the risk that football players and football recruits would sexually assault female University students as part of the recruiting program, including the risk that those assaults would be aided by excessive alcohol use by players, recruits, and female students. For ease of reference, I list these events by number. I conclude that only some of these events are arguably relevant to the Title IX notice issue.

**1) 1997 assault**—On December 6, 1997, a group of teenage high school girls attended a party held by football players and recruits. The party was held at an off-campus hotel. One of the teenage girls alleged that she was sexually assaulted by some of the recruits at the party. The Boulder County District Attorney investigated the matter but did not file sexual assault charges based on this incident. *Motion for Summary Judgment,* Exhibit A–1 (Byyny Declaration), ¶ 6. Criminal charges were filed against a CU athlete, who pled guilty to providing alcohol to minors. *Id.*

In January, 1998, CU Chancellor Richard Byyny learned that Boulder police were investigating the alleged December 6, 1997, sexual assaults. Byyny sent an e-mail to then Athletic Director Richard Tharp saying "we should clearly spell out our rules, responsibilities, and expectations" concerning recruits. *Simpson response,* Exhibit 1 (IIC Report), p. 17. In February, 1998, Byyny, Tharp, University legal counsel Bob Chichester, and other University officials met with the Boulder County District Attorney, and other officials of the District Attorney's office. Officials from the District Attorney's office

said that they believed the December, 1997, party was designed to provide sex to the recruits. They warned the University officials that this practice must stop. The District Attorney advised the University officials to establish zero-tolerance policies concerning alcohol use and sexual contact in the recruiting program.

This incident can be seen as providing an indication that alcohol use and sexual activity by players and recruits contributed to an alleged sexual assault in this incident. It must be noted, however, that the incident did not take place on the CU campus. In addition, this incident did not involve harassment that can be addressed under Title IX because the alleged victim was not a CU student. For this incident to contribute to notice of a Title IX risk, it must be assumed that the risk faced by this alleged victim also is faced by female CU students. It is not a great leap to make such an assumption, but the existence of the assumption is a further indication that this incident did not, *per se*, provide notice of the broader risk alleged by the plaintiffs, nor did it provide the kind of clear notice of a specific risk required by Title IX.

**2) Barnett's Arrival**—A new football coach, Gary Barnett, began work at the University in January, 1999. Neither Byyny nor Tharp told Barnett about the 1997 assault and the subsequent meeting with the DA's office. However, Chichester, who had attended the subsequent meeting with the DA's office, told Barnett about these events. These communications have two arguable implications. First, neither Byyny nor Tharp considered the 1997 incident to be important enough to edify Barnett. Second, and more important, Barnett was told of the 1997 incident and the 1998 meeting with the District Attorney's office. Thus, to the extent the 1997 assault and the meeting with the DA's office are relevant to Barnett having notice of a risk to female CU students, Barnett is charged with knowledge of these predicate events.

**3) Assaults by Players and Coaches**— The plaintiffs enumerate three incidents that, they contend, provided additional notice of the risk presented to female students by football players and recruits. First, in 1999, an assistant CU football coach pled guilty to third degree assault against his wife. Second, in 2000, a football player pled guilty to third degree assault based on an incident in which his wife was assaulted. Third, in 2001, Barnett hired a quondam CU football player as an assistant coach. This former player had been banned from campus five years earlier, based on a series of incidents and arrests that culminated in the assault of a female parking lot attendant. The record does not indicate whether or not the parking lot attendant was a CU student.

In its Answer to Ms. Simpson's First Amended Complaint, the University admits that a coach in 1999 and a player in 2000 each pled guilty to a criminal charge relating to a personal domestic matter. The University admits also that Barnett hired a former player in 2001, and that the player previously had "been accused of an incident related to a female parking attendant . . . ." *Answer to Simpson's First Amended Complaint,* p. 24.

I conclude that these events have little relevance to the issue of notice to the University about the risk in question: the risk that CU football players and recruits would sexually assault female University students as part of the recruiting program, and that those assaults would be aided by excessive alcohol use. The 1999 and 2000 incidents of domestic violence both involved spouses, not students, and occurred in a private context, not in the context of the funding recipient's football program. The nature of the alleged assault against a

parking lot attendant by the former player, who later was hired as an assistant coach, is not detailed in the record. This alleged assault occurred five years before this player was hired as an assistant coach. There is no allegation or other indication of recidivism during the succeeding five years. Under relevant Title IX standards, these incidents are not relevant to notice that female CU students faced a risk that football players and recruits would sexually assault female University students as part of the recruiting program.

4) **1999 Recruit**—In 1999, a recruit called Barnett to reject a scholarship offer because of improprieties he experienced during his recruiting visit to CU. *Gilmore response,* Exhibit 13 (Under Seal). This recruit told an assistant coach only that he was exposed to marijuana during his visit. *Id.* p. 128. The recruit agreed later to enroll at CU. Neither Barnett nor other football officials were told that this recruit had been exposed to alcohol and strippers during his recruiting visit until after December 7, 2001. While a player, this individual says he hosted a recruit at a strip club and hosted another recruit at a private party where lap dancers were present. It should be noted that there is no indication that these events took place on the CU campus or involved female CU students. Most importantly, there is no indication that these events were known to Barnett or to other relevant CU officials prior to December 7, 2001.

I conclude that the information from the 1999 recruit is not relevant to the issue of notice under Title IX. Prior to the assaults suffered by the plaintiffs, this recruit had told the football coaching staff only that he objected to his exposure to marijuana in his recruiting trip. Nothing in the record indicates that, prior to the assaults on the plaintiffs, this recruit provided any information to Barnett or other relevant University officials indicating that female CU students faced a risk of sexual assault by football players and recruits as part of the recruiting program.

5) **Katharine Hnida**—In 2000, Katharine Hnida was the only female player on the CU football team. Sometime in 2000, Katharine Hnida's father, Dr. David Hnida, contacted Barnett and Tharp about "multiple instances of sexual harassment of his daughter by CU football players, which the coaching staff had allowed to continue." *Simpson response,* Exhibit 11. Dr. Hnida does not specify in his affidavit the type of sexual harassment that was addressed in these contacts with Barnett and Tharp. Dr. Hnida says that in December, 2001, after reading in the press of sexual assaults at a CU football recruiting party, he informed Chancellor Byyny that Katherine Hnida had been physically, sexually, and verbally assaulted by members of the CU football team. *Id.*

The record contains no indication that there were any reported sexual assaults at a CU football recruiting party in December 7, 2001, other than the assaults described by Ms. Simpson and Ms. Gilmore in this case. Thus, it is apparent that Dr. Hnida contacted Byyny after reading press reports of the December 7, 2001, assaults at the party in Ms. Simpson's apartment. The information relayed by Dr. Hnida to Byyny in December, 2001, was relayed to Byyny after Dr. Hnida read press reports concerning the December 7, 2001, party, and after the plaintiffs suffered the assaults that are the basis of their claims in this case.

Dr. Hnida's affidavit does not specify the type of sexual harassment he discussed with Barnett and Tharp in 2000. I assume that the harassment Dr. Hnida described to Barnett was at least verbal harassment, because there is no basis in the record to conclude that he described more severe

harassment to Barnett in 2000. In this context, this incident provided notice that some male football players are willing to engage at least in verbal harassment of a female football player. It appears that particular players were known to have been involved in the harassment of Hnida. Such notice is, at most, only obliquely relevant to the broader risk alleged by the plaintiffs: the risk that football players and recruits would sexually assault female University students as part of the recruiting program, including the risk that those assaults would be aided or exacerbated by excessive alcohol use by players, recruits, and female students. The Hnida harassment could contribute to notice of such a broad risk only if the Hnida harassment is combined with other relevant incidents to indicate the existence of a much broader risk.

The harassment of Katherine Hnida involved player on player harassment by football players in an athletic milieu that is essentially *sui generis*. Relevantly, the record does not contain evidence that, prior to December 7, 2001, Barnett or other relevant University officials knew of physical or sexual harassment or sexual assault involving Katherine Hnida. I conclude that the unique context in which Ms. Hnida was sexually harassed, and the belated disclosure by Dr. Hnida of the physical and sexual assault of Hnida by football players, effectively extenuates, if not eliminates altogether, the efficacy of any notice to CU that female students were at risk of sexual assault by players and recruits involved in the recruiting program.

**6) October, 2001, Sexual Assault**—In October, 2001, Barnett became aware that a female student trainer in the athletic department had been sexually assaulted by a football player. The student's affidavit indicates that a football department official obtained assistance for the student, and

asked the student if she wanted to meet with Barnett and other officials of the football program. *Simpson's response,* Exhibit 12 (Under Seal). Barnett met with the student and discussed the incident with her. After this discussion, the student says, she felt that Barnett had intimidated her into not pressing criminal charges against the football player.

In the context of Title IX, this incident provided notice that the particular player involved in this incident presented a risk of sexual assault. It is difficult, however, to logically expand this discreet incident involving a particular player to notice that most or all football players and most or all recruits involved in the CU football recruiting program presented a risk of sexual assault against female CU students who might come into contact with these players and recruits. Such a stereotypical generalization is unwarranted. At most, such an incident could contribute to notice of such a broad risk only when this particular incident, combined with a constellation of other relevant incidents, tends to indicate the existence of a more pervasive risk.

**7) Previous Allegations Against Player–Hosts**—The plaintiffs claim that two of the player-hosts who were at Ms. Simpson's apartment on December 7, 2001, had been accused of earlier sexual assaults. Nothing in the record indicates that Barnett or any other relevant CU official was aware of these accusations prior to the party at Ms. Simpson's apartment. Thus, this belated information is irrelevant to the Title IX notice analysis.

### D.  Notice of the Alleged Risk Was Not Adequate

I conclude that the 1997 assault, the Katherine Hnida harassment, and the October, 2001, assault are the only incidents cited by the plaintiffs that were known to the relevant CU officials and that provide

some arguable support for the claim that the University was aware of the risk at issue. Again, that risk is the risk that football players and recruits would sexually assault female University students as part of the recruiting program, including the risk that those assaults would be aided or exacerbated by excessive alcohol use by players, recruits, and female students. Even when considered together, however, these three incidents do not combine into a constellation of relevant events that provides sufficient notice of the particular risk to sustain Title IX liability.

The 1997 incident and the 1998 meeting with the DA's office involved alcohol abuse and sexual assault perpetrated on a non-CU student by an identified group of players and recruits. The alleged actions of this group of recruits on this occasion cannot logically be seen as notice that all or most players and all or most recruits present a similar risk—*a fortiori,* to female CU students. This incident did not provide notice of the broad risk alleged by the plaintiffs, nor did it provide the kind of clear notice of a risk required by Title IX.

Again, the Katherine Hnida harassment reasonably can be seen as providing notice that some football players would engage in sexual harassment of a female football player who, coincidentally, also was a fellow student. Viewed in the light most favorable to the plaintiffs, these incidents, as reported to Barnett and others, provided some indication of a risk of sexual harassment in the football program. However, the Katherine Hnida harassment, as reported to Barnett, did not provide a clear indication that female CU students faced a risk that football players and recruits would sexually assault female University students. The harassment of Hnida did not provide notice of the broad risk alleged by the plaintiffs, nor did it provide the kind of clear notice of a risk required by Title IX.

Similarly, the October, 2001, sexual assault provided notice that the particular player involved in this incident presented a risk of sexual assault. It is difficult, however, logically to expand this incident involving a particular player to notice that most or all football players and most or all recruits involved in the CU football recruiting program presented a risk of sexual assault against all female students who might come into contact with these players and recruits.

Again, even when these incidents are considered together, they do not constitute a constellation of relevant events that provides sufficient notice of the broad risk of sexual harassment and assault at issue here. These incidents occurred over a span of approximately four years. Each incident involved some sort of sexual harassment or, in 1997 and 2001, sexual assault that was known to CU officials. The 1997 incident involved identified players and recruits, and the other incidents involved identified players. Only the 1997 incident was known to involve the excessive use of alcohol. In combination, these incidents reasonably can be seen as indicating that some players, and some recruits, had engaged in sexual harassment and sexual assault. However, these events cannot reasonably be construed as putting CU on notice of a risk that CU football players and recruits would sexually assault female University students as part of the recruiting program, including the risk that those assaults would be aided or exacerbated by excessive alcohol use by players, recruits, and female students.

The plaintiffs argue also that CU officials knew that alcohol and marijuana often were available to players and recruits at recruiting parties, and that host players sometimes would take recruits to strip

clubs or to parties where strippers were present. The evidence that Barnett and other relevant officials had such knowledge is spotty. However, assuming that these officials knew of such events, I find that such knowledge does not, for the purpose of Title IX, contribute significantly to notice that CU football players and recruits presented a risk of sexual assault to female University students as part of the recruiting program. Although many people find some or all of these activities offensive, especially when they perceive that they are sanctioned by the University, participation in any or all of these activities does not inexorably lead to sexual assault—*a fortiori*, of female CU students.

### E. Conclusion

The evidence cited by the plaintiffs indicates that relevant CU officials were aware of some incidents of sexual harassment, sexual assaults, and alcohol use by certain identified football players and football recruits over a period spanning approximately four years preceding the plaintiffs' assaults. Considered as a whole, however, all of the relevant information known to the CU officials did not constitute adequate notice, under Title IX, that female CU students, including the plaintiffs, faced a risk that CU football players and recruits would sexually assault female University students as part of the recruiting program, including the risk that those assaults would be aided or exacerbated by excessive alcohol use by players, recruits, and female students. Viewing the facts in the record in the light most favorable to the plaintiffs, I conclude that a reasonable fact finder could not find that the University had adequate notice, under Title IX, of the risk at issue in this case. Absent sufficient evidence that the University was on notice of this risk, the plaintiffs cannot prove their Title IX claim against the Uni-

versity. The University is entitled to judgment as a matter of law.

## VI. WHETHER THE UNIVERSITY WAS DELIBERATELY INDIFFERENT TO A KNOWN RISK

█ Had the plaintiffs demonstrated that the University was on notice of a risk of sexual assault by football players and football recruits, then the plaintiffs must demonstrate that the University was deliberately indifferent to this known risk and, thus, caused the plaintiffs to be sexually assaulted. Assuming *arguendo* that the University knew of the risk, I conclude that the plaintiffs have not demonstrated that the University acted with deliberate indifference.

Deliberate indifference is a high standard. A school's response to a risk is not deliberately indifferent unless it is "clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648, 119 S.Ct. 1661. The *Davis* majority emphasized that deliberate indifference is not a mere reasonableness, i.e., negligence, standard. Rather, deliberate indifference "amounts to an intentional violation of Title IX," *Id.* at 643, 119 S.Ct. 1661, or "a conscious decision to permit sex discrimination in [a school's] programs ...", *Murrell*, 186 F.3d at 1246. "Officials may avoid liability under a deliberate indifference standard by responding reasonably to a risk of harm, 'even if the harm ultimately was not averted.'" *Doe v. Dallas Indep. School Dist.*, 220 F.3d 380, 384 (quoting *Farmer v. Brennan*, 511 U.S. 825, 844, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). It is important to note that, in applying the Title IX deliberate indifference standard, a defendant's response must be judged "in light of the known circumstances." *Davis*, 526 U.S. at 648, 119 S.Ct. 1661.

The University argues that it promptly and properly reacted to the 1997 assault

on a woman who was not a CU student. The two recruits involved in the incident were not admitted to the University. *Motion for Summary Judgment*, Exhibit A–1 (Byyny Declaration), ¶ 7. A football player involved in the incident was charged with violations of the University Code of Conduct, and the player was suspended for one semester. *Id.* After the suspension was completed, the football coach suspended the player for one game. *Id.* In 1998, the University athletic department developed new written recruiting guidelines, held a life skills seminar for all student athletes, which included training on sexual harassment, and adopted a sexual assault protocol. *Id.* The content of these guidelines, training, and protocol is not reflected in the record.

Since 1999, the football program has distributed a football handbook to each of its student athletes. *Id.* The handbook includes sections on date rape and social policy, rape awareness and prevention strategies for men, sexual assault laws, and restrictions on alcohol use. *Id.*, Exhibits A–1, A–4. The football coaches meet each year with all football players, including players who serve as recruiting hosts, to review the handbook and provide training on the materials in the handbook. *Id.* ¶ 5. On July 1, 1999, the University adopted a university-wide Policy on Sexual Harassment. *Id.* ¶ 2.

The plaintiffs argue that CU did not make any changes to address the concerns expressed by the DA's office in 1998. The plaintiffs note evidence that sex and alcohol continued to be used in the football recruiting program into 2004. The plaintiffs say Athletic Director Tharp rejected zero tolerance rules proposed by Chancellor Byyny after the 1997 assaults. The record indicates that Byyny did propose such rules, but they never were adopted. *Simpson response*, Exhibit 1 (*IIC Report*),

pp. 18–19. The plaintiffs argue that the University's failure to adopt zero tolerance policies for student athletes after the 1997 incident indicates deliberate indifference to the risk at issue.

The plaintiffs argue also that CU did not adequately explain or enforce rules regarding recruit behavior, and did not adequately supervise recruits and the football players who acted as their hosts. Chichester's testimony indicates that Barnett and Tharp were reluctant to impose detailed guidelines for the recruiting program prior to December, 2001. *Simpson response*, Exhibit 2, pp. 167–72 (under seal). The plaintiffs argue also that the University failed to provide adequate sexual assault and harassment training for students and employees.

The plaintiffs further fault CU because the University's Sexual Harassment Policy and student code of conduct do not address football recruiting issues, or issues of sexual harassment and assault in the football program. *Gilmore response*, p. 6; *Simpson response*, p. 7. Further, the plaintiffs note that CU's football handbook never has instructed player hosts regarding alcohol or sex in recruiting. *Id.*

The fact that Barnett reacted to the harassment of Hnida by verbally reprimanding one player, and nothing more, also indicates deliberate indifference to sexual harassment, according to the plaintiffs. The plaintiffs argue that Barnett's alleged efforts to dissuade the victim of the October, 2001, sexual assault by a player from filing charges also indicates deliberate indifference to the risk of sexual assault by players and recruits. The plaintiffs point also to the Independent Investigative Commission's conclusion that Athletic Director Tharp adopted a "plausible deniability" policy "with respect to allegations of partying by recruits and hosts." *IIC Report*, p. 13.

The Title IX deliberate indifference standard does not require a school to devise, adopt, and enforce the most effective possible policies once the school becomes aware of a risk. Rather, the burden is on a plaintiff to demonstrate that the school's failure to exercise its control over the known relevant risk was so clearly unreasonable that the failure demonstrates a conscious or intentional decision to permit the risk to continue, causing the plaintiff to suffer discrimination. *Davis*, 526 U.S. at 643–49, 119 S.Ct. 1661; *Murrell*, 186 F.3d at 1246. I conclude that the actions taken by the University in response to the 1997 assault, and the policies adopted by the University and the football program after the 1997 assault, were not clearly unreasonable and do not indicate that the University intentionally decided to permit severe and pervasive sexual harassment against female CU students. The University investigated the relevant incidents, imposed discipline on those involved, and implemented policies and training directed to the issues of sexual harassment and assault, and alcohol use in the football program. The fact that the University's efforts on several fronts can be seen, in hindsight, as ineffectual does not establish an intentional decision to permit the relevant risk to remain unaddressed, and, thus, does not establish deliberate indifference. *See, e.g., Doe v. Dallas Indep. School Dist.*, 220 F.3d 380, 388–89 (5th Cir.2000). In short, to the extent the 1997 assault, the harassment of Hnida, and the 2001 assault can be seen as putting the University on notice of a risk of sexual assault by players and recruits against female students, the University's reactions to these events cannot be said to be clearly unreasonable.

The plaintiffs argue that the University's actions were so minimal and so ineffectual that they reflect deliberate indifference. The IIC Report contains numerous criticisms of the policies adopted by the University and the football program. Additionally, the IIC Report contains numerous criticisms of the University's and the football program's failure to adequately supervise various endeavors, including the recruiting program. The facts recited by the IIC are, for the most part, consistent with the facts of record in this case, viewing the record in the light most favorable to the plaintiffs. I note, however, that the IIC concluded in its report that there "is no clear evidence that University officials knowingly sanctioned ... or had direct involvement" in the use of sex, alcohol, and drugs to entertain recruits. *IIC Report*, p. 5. The IIC also notes positive steps taken by Barnett, including the material in the football handbook on alcohol abuse and sexual assault. *Id.* p. 24.

The IIC examined these issues in an effort to develop wise and appropriate University policy. It is important to note that wise and appropriate University policy is not the standard by which a Title IX claim is judged. Deliberate Indifference is the relevant standard. Applying this standard, the conclusions of the IIC are consistent with my conclusion that the actions of the University, in light of the relevant circumstances known to relevant University officials, do not demonstrate deliberate indifference to the relevant risk.

Finally, I note that the plaintiffs cite various actions by University officials after December 7, 2001, as probative of the University's deliberate indifference. I conclude that, in the context of this case, these actions are not relevant to the deliberate indifference analysis. Again, the University is liable in damages under Title IX only when its deliberate indifference effectively caused the discrimination. *Davis*, 526 U.S. at 646–47, 119 S.Ct. 1661. Absent sufficient evidence that the University had sufficient notice of the relevant risk, or

that the University acted with deliberate indifference with regard to that risk, a reasonable fact finder could not conclude that the University's deliberate indifference caused the plaintiffs to suffer the severe sexual harassment they suffered. Accordingly, evidence that the University exhibited deliberate indifference after the key discriminatory event at issue does not tend to show that the University's deliberate indifference caused the severe sexual harassment suffered by the plaintiffs.

Viewing the facts in the record in the light most favorable to the plaintiffs, I conclude that a reasonable fact finder could not find that the University was deliberately indifferent to the risk that CU football players and recruits would sexually assault female University students as part of the recruiting program, including the risk that those assaults would be aided or exacerbated by excessive alcohol use by female students, football players, and recruits. Absent sufficient evidence that the University acted with deliberate indifference, the plaintiffs cannot prove their Title IX claim against the University. The University is entitled to judgment as a matter of law.

## VII. OTHER TITLE IX ELEMENTS

I reiterate that for the purpose of the University's motion for summary judgment, it is not disputed that the plaintiffs were subjected to severe and objectively offensive sexual harassment on December 7, 2001. However, absent evidence that the University had actual knowledge of the relevant risk, and then was deliberately indifferent to this known risk, a reasonable fact finder could not find that the University's deliberate indifference caused the plaintiffs to be subjected to such harassment.

The University argues also that the plaintiffs have not presented evidence that the harassment they suffered occurred under an educational activity of the University, or that the harassment had the systemic effect of depriving the plaintiffs of access to educational benefits or opportunities. On the current record, I conclude that there are one or more genuine issues of material fact relevant to these elements of the plaintiffs' Title IX claim.

## VIII. INJUNCTIVE RELIEF

■ The plaintiffs argue that, in addition to damages, they also are entitled to injunctive relief under Title IX. The plaintiffs' standing to seek injunctive relief is dependent on whether they are likely to suffer future injury from the type of sex discrimination alleged in their complaints. *City of Los Angeles v. Lyons,* 461 U.S. 95, 105, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983).

Ms. Simpson has withdrawn from the University. *Simpson response,* p. 12. Ms. Ms. Gilmore apparently is a current CU student. She says she continues to suffer from the hostile environment created at CU following the December 7, 2001, sexual assaults. She notes the University allegedly continued to recruit one of the recruits who assaulted Ms. Simpson, and did not punish the football players involved. *Gilmore response,* p. 11. She notes further that CU's dissemination of private information and CU's "media tactics" contributed to her distress. She claims also she has been hurt by "CU officials' punishing, hostile, scorched earth campaign against her and the other women who have reported sexual impropriety, harassment or abuse by football players." *Id.* In support of this contention, Ms. Gilmore cites two pages of a transcript of her deposition. *Gilmore response,* Exhibit 99, pp. 473–74 (under seal). Ms. Gilmore's statements on these pages do not support her contention that she has suffered from a "scorched earth campaign against her. . . ."

On this record, I conclude that Ms. Simpson and Ms. Gilmore do not have standing to seek injunctive relief because they have not demonstrated that they are likely to suffer future injury from the type of sex discrimination alleged in their complaint. Further, I conclude that much of the injunctive relief requested in their Complaints is substantially broader than the injunctive relief available under Title IX.

## IX. ORDERS

**THEREFORE, IT IS ORDERED** as follows:

1) That the defendant University of Colorado's Motion for Summary Judgment [# 219], filed May 5, 2004, is **GRANTED**;

2) That the plaintiffs' First Amended Complaints are **DISMISSED WITH PREJUDICE**;

3) That **JUDGMENT SHALL ENTER** in favor of the defendant and against the plaintiffs;

4) That the defendant is **AWARDED** its costs, to be taxed by the Clerk of the Court pursuant to FED. R. CIV. P. 54(d)(1) and D.C.COLO.LCIVR 54.1;

5) That the trial preparation conferences, set for May 6 and 27, 2005, are **VACATED**;

6) That the trial set for May 31, 2005, is **VACATED**;

7) That any other pending motions are **DENIED** as **MOOT**, except for the pending motions to seal [# s 472, 478, 490, 495, 515, 517, 523, 539, 540, 545, 546, 547, 548, 554, 557, 559, 568, 581, 589, 596, 600, 601, 604, 608, 610, 612, 614, 616, 619, 621, 624, 638, 640, 643, and 649], and the pending motions for sanctions [# 545]; and

8) That the reference to United States Magistrate Judge Craig B. Shaffer of the extant pending motions to seal and motion for sanctions, listed above, shall remain in effect.