**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**September 6, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

LISA SIMPSON; ANNE GILMORE,

        Plaintiffs - Appellants,

    v.

UNIVERSITY OF COLORADO
BOULDER, through its Board; THE
REGENTS OF THE UNIVERSITY OF
COLORADO,

        Defendants - Appellees,

----------------------------------------

AMERICAN CIVIL LIBERTIES
UNION; AMERICAN CIVIL
LIBERTIES UNION FOUNDATION
OF COLORADO, INC.; ASIAN
AMERICAN LEGAL DEFENSE &
EDUCATION FUND; CALIFORNIA
WOMEN'S LAW CENTER;
CONNECTICUT WOMEN'S
EDUCATION AND LEGAL FUND;
LAWYERS' COMMITTEE FOR
CIVIL RIGHTS UNDER LAW;
LEGAL MOMENTUM; MEXICAN
AMERICAN LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.;
NATIONAL ASIAN PACIFIC
AMERICAN WOMEN'S FORUM;
NATIONAL ASSOCIATION FOR
THE ADVANCEMENT OF
COLORED PEOPLE; NAACP LEGAL
DEFENSE AND EDUCATIONAL

No. 06-1184
No. 07-1182

FUND, INC.; NATIONAL PARTNERSHIP FOR WOMEN AND FAMILIES; NORTHWEST WOMEN'S LAW CENTER; SARGENT SCHRIVER NATIONAL CENTER ON POVERTY LAW; SOUTHWEST WOMEN'S LAW CENTER; WOMEN'S LAW PROJECT; WOMEN'S SPORTS FOUNDATION; AMERICAN ASSOCIATION OF UNIVERSITY WOMEN; AAUW EDUCATIONAL FOUNDATION; NATIONAL COALITION AGAINST VIOLENT ATHLETES; SECURITY ON CAMPUS, INC.; JAY COAKLEY, Ph.D.; ANGELA HATTERY, Ph.D.; MARY G. MCDONALD, Ph.D.; MICHAEL A. MESSNER, Ph.D.; DON SABO, Ph.D.; ALLEN SACK, Ph.D.; EARL SMITH, Ph.D.; ELLEN STAUROWSKY, Ph.D.; STEPHEN WALK, Ph.D.,

Amicus Curiae.

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. NO. 02-cv-2390-REB-CBS)**

---

Blaine P. Kerr, Hutchinson Black and Cook, LLC, Boulder Colorado (Kimberly M. Hult, Christopher W. Ford, Hutchinson Black and Cook, LLC; Honorable Patricia M. Wald, Washington, DC; Pamela S. Karlan, Stanford Law School, Stanford, CA; Jocelyn Samuels, Dina R. Lassow, Neena K. Chaudhry, Ellen Eardly, of counsel, Washington, DC, with her on the briefs, for the Plaintiff - Appellant Simpson; and Seth J. Benezra, John A Culver, Benezra & Culver, LLC,

-2-

Lakewood, CO, and Peggy R. Jessel, Peggy Jessel, LLC, Boulder, CO, with her on the briefs, for Plaintiff - Appellant Gilmore).

Patrick T. O'Rourke, Office of University Counsel, Denver, Colorado, (David P. Temple, Office of University Counsel; Daniel M. Reilly, Larry S. Pozner, Sean Connolly, Reilly, Pozner & Connelly LLP, Denver, Colorado, with him on the briefs), for the Defendants - Appellees.

Jonathan J. Frankel, Thomas P. Olson, Katherine A. Gillespie, Sarah K. Hurwitz, Anjana Malhotra, Wilmer Cutler Pickering Hale and Dorr LLP, Washington, DC, filed an amicus curiae brief on behalf of Women's Sports Foundation, American Association of University Women, AAUW Educational Foundation, National Coalition Against Violent Athletes, Security on Campus, and Professors Who Study Gender, Violence and Sports, in support of Plaintiffs - Appellants.

Lenora M. Lapidus, American Civil Liberties Union Foundation, New York, NY, filed an amicus curiae brief on behalf of American Civil Liberties Union, American Civil Liberties Union Foundation of Colorado, Asian American Legal Defense and Education Fund, California Women's Law Center, Connecticut Women's Education and Legal Fund, Lawyers' Committee for Civil Rights Under Law, Legal Momentum, Mexican American Legal Defense and Educational Fund, Inc., National Asian Pacific American Women's Forum, National Association for the Advancement of Colored People, NAACP Legal Defense and Educational Fund, Inc., National Partnership for Women and Families, Northwest Women's Law Center, Sargent Shriver National Center on Poverty Law, Southwest Women's Law Center, and Women's Law Project, in support of Plaintiffs - Appellants.

---

Before **HARTZ**, **McKAY**, and **GORSUCH**, Circuit Judges.

---

**HARTZ**, Circuit Judge.

---

Lisa Simpson and Anne Gilmore (Plaintiffs) claim that they were sexually assaulted on the night of December 7, 2001, by football players and recruits of the University of Colorado at Boulder (CU). They brought this action against CU

under Title IX of the Education Amendments of 1972. *See* 20 U.S.C. §§ 1681–1688. The district court granted summary judgment for CU, *see Simpson v. Univ. of Colo.*, 372 F. Supp. 2d 1229, 1246 (D. Colo. 2005), and later denied motions to alter or amend the judgment and to reopen discovery. Plaintiffs appealed these rulings in our case number 06-1184. Later the district court denied a second motion for relief from judgment. Plaintiffs appealed that ruling in our case number 07-1182. We grant Plaintiffs' motion to consolidate the two appeals. Two amicus curiae briefs have been submitted by organizations in support of Plaintiffs' position.[1] We have jurisdiction under 28 U.S.C. § 1291. In our view, the evidence presented to the district court on CU's motion for summary judgment is sufficient to support findings (1) that CU had an official policy of showing high-school football recruits a "good time" on their visits to the CU campus, (2) that the alleged sexual assaults were caused by CU's failure to

---

[1]The first amicus brief was submitted on behalf of the American Civil Liberties Union, American Civil Liberties Union Foundation of Colorado, Inc., Asian American Legal Defense and Education Fund, California Women's Law Center, Connecticut Women's Education and Legal Fund, Lawyers' Committee for Civil Rights Under Law, Legal Momentum, Mexican American Legal Defense and Educational Fund, Inc., National Asian Pacific American Women's Forum, National Association for the Advancement of Colored People, NAACP Legal Defense and Educational Fund, Inc., National Partnership for Women and Families, Northwest Women's Law Center, Sargent Shriver National Center on Poverty Law, Southwest Women's Law Center, and Women's Law Project. The second amicus brief was submitted on behalf of the Women's Sports Foundation, American Association of University Women, AAUW Educational Foundation, National Coalition Against Violent Athletes, Security on Campus, Inc., and certain professors who study gender, violence and sports.

provide adequate supervision and guidance to player-hosts chosen to show the football recruits a "good time," and (3) that the likelihood of such misconduct was so obvious that CU's failure was the result of deliberate indifference.  We therefore hold that CU was not entitled to summary judgment.  Because we reverse and remand for further proceedings, we need not address the merits of the postjudgment motions.

## I.    BACKGROUND

We will briefly state the gist of Plaintiffs' claims before addressing the procedural posture of the case and the governing law.  Then we will discuss the evidence in significantly greater detail.  We view the evidence presented to the district court in the light most favorable to the parties opposing summary judgment—namely, Plaintiffs.  *See Escue v. N. Okla. Coll.*, 450 F.3d 1146, 1152 (10th Cir. 2006).[2]

### A.    Plaintiffs' Allegations

Plaintiffs were sexually assaulted in Ms. Simpson's apartment by CU football players and high-school students on a recruiting visit.  The CU football team recruited talented high-school players each fall by bringing them to campus.  Part of the sales effort was to show recruits "a good time."  To this end, recruits

_____

[2] We rely solely on materials before the district court at summary judgment. This includes materials in volumes I, II, III, VI and VII of the appendix, as well as portions of volumes IV and VIII.  Materials in volumes V, IX, X, XI, and XII of the appendix were submitted after the district court entered summary judgment.

were paired with female "Ambassadors," who showed them around campus, and player-hosts, who were responsible for the recruits' entertainment. At least some of the recruits who came to Ms. Simpson's apartment had been promised an opportunity to have sex.

By the time of the alleged assaults of Plaintiffs, there were a variety of sources of information suggesting the risks that sexual assault would occur if recruiting was inadequately supervised. These included reports not specific to CU regarding the serious risk of sexual assaults by student-athletes. There was also information specific to CU. In 1997 a high-school girl was assaulted by CU recruits at a party hosted by a CU football player. The local district attorney initiated a meeting with top CU officials, telling them that CU needed to develop policies for supervising recruits and implement sexual-assault-prevention training for football players. Yet CU did little to change its policies or training following that meeting. In particular, player-hosts were not instructed on the limits of appropriate entertainment.

Moreover, events within the football program did not suggest that training relating to recruiting visits was unnecessary. Not only was the coaching staff informed of sexual harassment and assault by players, but it responded in ways that were more likely to encourage than eliminate such misconduct.

**B.    Court Proceedings**

On December 9, 2002, Ms. Simpson filed a complaint in Colorado state court; on December 23 CU removed the action to the United States District Court for the District of Colorado.  Ms. Gilmore filed her complaint in federal district court on December 8, 2003.  The two cases were consolidated on January 30, 2004.  In their complaints Plaintiffs sought relief under Title IX, 20 U.S.C. § 1681(a), claiming that CU knew of the risk of sexual harassment of female CU students in connection with the CU football recruiting program and that it failed to take any action to prevent further harassment before their assaults.

On May 5, 2004, CU filed a summary-judgment motion contending that Plaintiffs could not establish the elements of a Title IX claim.  In granting CU's motion on March 31, 2005, the district court ruled that no rational person could find (1) that CU had actual notice of sexual harassment of CU students by football players and recruits before Plaintiffs' assaults or (2) that CU was deliberately indifferent to such harassment.  *Simpson*, 372 F. Supp. 2d at 1235.  The court also observed that a fact-finder could not find causation because of the lack of evidence of notice and deliberate indifference.  *See id.* at 1245.  On May 23, 2006, the court denied motions to alter or amend the judgment and to reopen discovery.  On April 24, 2007, after Plaintiffs had already appealed these rulings, it denied an additional motion by Plaintiffs for relief from judgment.

## II.   DISCUSSION

### A.   Governing Law

"We review the district court's grant of summary judgment de novo. Summary judgment is appropriate only where 'there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.'" *Escue*, 450 F.3d at 1152 (citation and ellipsis omitted) (quoting Fed. R. Civ. P. 56(c)).

Title IX provides in pertinent part:  "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).  The United States Supreme Court has held that Title IX authorizes private suits for damages in certain circumstances.  *See Franklin v. Gwinnett County Pub. Sch.*, 503 U.S. 60, 76 (1992); *see also Cannon v. Univ. of Chi.*, 441 U.S. 677, 717 (1979).  Two Supreme Court cases have addressed the contours of Title IX damages suits for sexual harassment.  In *Gebser v. Lago Vista Independent School District*, 524 U.S. 274 (1998), the complaint alleged sexual harassment of a student by a teacher.  In *Davis ex rel. LaShonda D. v. Monroe County Board of Education*, 526 U.S. 629 (1999), the complaint alleged student-on-student harassment.

Both parties in the case before us have treated Plaintiffs' claims as claims of student-on-student harassment subject to the specific requirements of *Davis*.

-8-

In our view, however, Plaintiffs' claims have critical elements that make the student-on-student-harassment framework an imperfect one for analysis of their claims. The alleged sexual assaults were not simply misconduct that happened to occur at CU among its students. Plaintiffs allege that the assaults arose out of an official school program, the recruitment of high-school athletes. Indeed, they allege that the assaults were the natural, perhaps inevitable, consequence of an officially sanctioned but unsupervised effort to show recruits a "good time." Although we find this situation distinguishable from those addressed in *Gebser* and *Davis*, we can determine the requirements for a Title IX claim in this context only after seeking guidance in these two decisions.

In *Gebser* the Supreme Court held that a student's claim for money damages based on sexual harassment by a teacher could arise under Title IX, but only if (1) "an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the [funding] recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond," and (2) the inadequate response "amount[s] to deliberate indifference to discrimination." 524 U.S. at 290. The Court rejected two alternative bases of liability advanced by the plaintiffs. First, it rejected a respondeat-superior claim predicated on the notion that the authority conveyed to the teacher by the school district facilitated the harassment. *See id.* at 282. Second, it rejected the notion that the district could be liable based on

constructive notice—that is, that the district "'should have known' about harassment but failed to uncover and eliminate it." *Id.*

*Gebser*'s requirements for a Title IX claim were premised on two propositions. First, Title IX was enacted under Congress's spending power, which allows it to "provide for the . . . general Welfare of the United States," U.S. Const. art. I, § 8, cl. 1, and to attach conditions on the funds it provides, *see Gebser*, 524 U.S. at 286–87. Consistent with this power, Title IX "condition[s] an offer of federal funding on a promise by the recipient not to discriminate, in what amounts essentially to a contract between the Government and the recipient of funds." *Id.* at 286. Because of Title IX's contractual nature, the Court decided that a funding recipient could be "liable in monetary damages for noncompliance with the condition," *id.* at 287, only if it "has notice that it will be liable for a monetary award," *id.* (brackets and internal quotation marks omitted). In other words, a funding recipient must have notice of its noncompliance with Title IX before it can be held liable for money damages.

Second, the provisions of Title IX indicate that a funding recipient should be liable only for its own actions, and not for the independent actions of an employee or a student. The Court observed that the administrative-enforcement scheme for Title IX permitted the imposition of financial penalties only after funding recipients received actual notice of discrimination within their programs and were given an opportunity to institute corrective measures; they would be

-10-

subject to sanctions only for their failure to respond rather than for an employee's independent acts. *Id.* at 287–89. "Where a statute's express enforcement scheme hinges its most severe sanction on notice and unsuccessful efforts to obtain compliance," said the Court, "we cannot attribute to Congress the intention to have implied an enforcement scheme that allows imposition of greater liability without comparable conditions." *Id.* at 290. The claim in *Gebser* thus did not survive because the plaintiffs had conceded that the school district did not have actual knowledge of harassment. *Id.* at 291.

*Gebser* also rejected the plaintiffs' contention that liability could be based on the school district's "failure to promulgate and publicize an effective policy and grievance procedure for sexual harassment claims." *Id.* It explained that the school district's alleged violation of federal regulations requiring such procedures did not establish the requisite actual notice or deliberate indifference, and "the failure to promulgate a grievance procedure does not itself constitute 'discrimination' under Title IX." *Id.* at 292.

Relevant to the claims before us are two remarks by the Court that suggest that the *Gebser* standards do not apply to some Title IX harassment claims and indicate what the standards should be for those claims. First, the Court noted a limitation when setting forth the requirements of actual knowledge and an inadequate response. It restricted these requirements to "cases like this one that do not involve official policy of the [school district]." *Id.* at 290. Second, it

-11-

suggested that courts can find guidance in civil-rights cases alleging municipal liability under 42 U.S.C. § 1983. Explaining why liability would arise only when the school's inadequate response amounted to deliberate indifference to discrimination, the Court wrote:

> The administrative enforcement scheme presupposes that an official who is advised of a Title IX violation refuses to take action to bring the recipient into compliance. The premise, in other words, is an official decision by the recipient not to remedy the violation. That framework finds a rough parallel in the standard of deliberate indifference. Under a lower standard, there would be a risk that the recipient would be liable in damages not for its own official decision but instead for its employees' independent actions. Comparable considerations led to our adoption of a deliberate indifference standard for claims under § 1983 alleging that a municipality's actions in failing to prevent a deprivation of federal rights was the cause of the violation. See *Board of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397 (1997); *Canton v. Harris*, 489 U.S. 378, 388–392 (1989).

*Gebser*, 524 U.S. at 290–91. We will return to these two remarks after a brief discussion of *Davis*.

*Davis* held that the plaintiffs had stated a claim for damages under Title IX when they alleged that a fifth-grade student had been subjected to five months of physical and verbal harassment by a classmate and that school officials informed of the harassment had failed to take any action to investigate or stop it. *See* 526 U.S. at 633–35, 653–54. The Court addressed two distinct components of the claim. One was the nature and extent of the injury to the student. The Court held that a student's harassment by a peer constitutes "discrimination" under Title IX

-12-

if it "is so severe, pervasive, and objectively offensive, and . . . so undermines and detracts from the victim['s] educational experience, that the victim-student[] [is] effectively denied equal access to an institution's resources and opportunities." *Id.* at 651. The district court did not rule that Plaintiffs had failed to establish this component of their cause of action, and it is not at issue on appeal.

The second component addressed in *Davis* is the role and responsibility of the funding recipient. Although acknowledging that a school receiving federal funds cannot be liable unless it has notice that its conduct could subject it to a damages claim, the Court said that "this limitation on private damages actions is not a bar to liability where a funding recipient intentionally violates the statute." *Id.* at 642. It noted that in *Gebser* it had rejected a negligence standard for liability—namely, a standard that would have imposed liability on a school district for "failure to react to teacher-student harassment of which it . . . *should have* known"—but instead had "concluded that the district could be liable for damages only where the district itself intentionally acted in clear violation of Title IX by remaining deliberately indifferent to acts of teacher-student harassment of which it had actual knowledge." *Id.* In further expounding the standard for liability the Court said:

> The statute's plain language confines the scope of prohibited conduct based on the recipient's degree of control over the harasser and the environment in which the harassment occurs. If a funding recipient

> does not engage in harassment directly, it may not be liable for damages unless its deliberate indifference subjects its students to harassment. That is, the deliberate indifference must, at a minimum, cause students to undergo harassment or make them liable or vulnerable to it.

*Id.* at 644–45 (brackets and internal quotation marks omitted). "These factors," it continued,

> combine to limit a recipient's damages liability to circumstances wherein the recipient exercises substantial control over both the harasser and the context in which the known harassment occurs. Only then can the recipient be said to "expose" its students to harassment or "cause" them to undergo it "under" the recipient's programs.

*Id.* at 645.

The second component of Plaintiffs' claims—the role and responsibility of CU—is the focus of this appeal. We do not believe, however, that the formulation of this component in *Gebser* and *Davis* translates perfectly to the context of this case. We find it significant that in those cases there was no element of encouragement of the misconduct by the school district. To be sure, in those cases the school district could anticipate that the very operation of a school would be accompanied by sexual harassment, but that is simply because, unfortunately, some flawed humans will engage in such misconduct when they are in the company of others. Here, however, the gist of the complaint is that CU sanctioned, supported, even funded, a program (showing recruits a "good time") that, without proper control, would encourage young men to engage in

-14-

opprobrious acts. We do not think that the notice standards established for sexual-harassment claims in *Gebser* and *Davis* necessarily apply in this circumstance.

*Gebser* suggested as much in the remarks we referenced above. The Court said that the requirements it imposed applied to "cases like this one that do not involve official policy of the [school district]." 524 U.S. at 290. The Court did not elaborate on what it meant by "involve official policy," but the essence of the point is suggested by its reliance in the following paragraph on the doctrine regarding the imposition of liability on municipalities under 42 U.S.C. § 1983 for civil-rights violations. The Court supported the deliberate-indifference requirement for Title IX liability by observing that "[c]omparable considerations led to our adoption of a deliberate indifference standard for claims under § 1983 alleging that a municipality's actions in failing to prevent a deprivation of federal rights was the cause of the violation." *Id*. at 291. What is "comparable" is the requirement for both § 1983 municipal liability and Title IX funding-recipient liability that the institution itself, rather than its employees (or students), be the wrongdoer. Under Title IX the school district "could be liable for damages only where the district itself intentionally acted in clear violation of Title IX." *Davis*, 526 U.S. at 642. The funding recipient should be liable only "for its own official decision," not "its employees' independent actions." *Gebser*, 524 U.S. at 291. Likewise, under § 1983 a municipality is not liable under respondeat superior

doctrine but only for its own civil-rights violations. "[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 694 (1978).

In the context of *Gebser* or *Davis*, the school district could not be said to have *intentionally* subjected students to harassment unless it knew of the harassment and deliberately decided not to take remedial action. But the § 1983 municipal-liability cases reveal how the standard changes when the claim "involve[s] official policy," *Gebser*, 524 U.S. at 290, although the underlying principle—liability only for intentional acts by the institution itself—remains the same.

One of the cases cited by *Gebser* as support for the deliberate-indifference requirement, *see id.* at 291, is *City of Canton v. Harris*, 489 U.S. 378 (1989). In that case the Court held that a municipality may be liable under § 1983 for an officer's constitutional violation if the violation was the result of inadequate police training and the municipality's failure to train the officer amounted to deliberate indifference to the rights of those "with whom police come into contact." *Id.* at 388. Although recognizing that a municipality is liable under § 1983 for a constitutional violation by one of its officers only if the officer's action is caused by a municipal policy or custom, *see id.* at 385, the Court

-16-

declared that the policy itself need not be unconstitutional, *id.* at 387.  Rather**,** failure to conduct an adequate training program for implementation of an otherwise valid policy may represent a municipal policy on which liability can rest.  *See id.* at 389–90.  To be sure, typically a municipality would not intentionally have a training program that was clearly inadequate, but the Court explained:

> [I]t may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.

*Id.* at 390.  We conclude that a funding recipient can be said to have "intentionally acted in clear violation of Title IX," *Davis*, 526 U.S. at 642, when the violation is caused by official policy, which may be a policy of deliberate indifference to providing adequate training or guidance that is obviously necessary for implementation of a specific program or policy of the recipient.  Implementation of an official policy can certainly be a circumstance in which the recipient exercises significant "control over the harasser and the environment in which the harassment occurs."  *Id.* at 644.

In applying this standard we take note of *Canton*'s discussion of what is meant by an "obvious" need for training.  It recognized that a need could be "obvious" for reasons other than knowledge of previous incidents within the municipality:

> For example, city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations on the use of deadly force can be said to be "so obvious," that failure to do so could properly be characterized as "deliberate indifference" to constitutional rights.

*Canton*, 489 U.S. at 390 n.10 (citation omitted). The Court elaborated on this point in *Board of County Commissioners of Bryan County, Oklahoma v. Brown*, 520 U.S. 397 (1997), which held that a sheriff's isolated failure to perform adequate screening of a potential deputy did not establish deliberate indifference to a risk that the deputy would use excessive force, *id.* at 415–16. But it reaffirmed *Canton*'s holding that deliberate-indifference claims could be established by a failure to train for certain obvious risks: "In *Canton*, we did not foreclose the possibility that evidence of a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, could trigger municipal liability." *Id.* at 409; *see Allen v. Muskogee, Okla.*, 119 F.3d 837, 843, 845 (10th Cir. 1997) (when city trained officers "to leave cover and approach armed, suicidal, emotionally disturbed persons and . . . try to disarm them," plaintiff's claim fell within "the narrow range of circumstances . . . under which a single violation of federal rights may be a highly predictable consequence of failure to train officers to handle recurring situations with an obvious potential

for such a violation" (internal quotation marks omitted)); *see also Brown v. Gray*, 227 F.3d 1278, 1290 (10th Cir. 2000).

## B.     Evidence at Summary Judgment

We now review the evidence presented in the summary-judgment filings in the light most favorable to Plaintiffs to determine whether it can satisfy the above standard. *See Escue*, 450 F.3d at 1152. At summary judgment,

> the relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. . . . [S]ummary judgment will not lie if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Bingaman v. Kan. City Power & Light Co.*, 1 F.3d 976, 980–81 (10th Cir. 1993) (ellipsis omitted) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 248 (1986)) .

The CU football program is one of the premier programs in the country. From 1989–2005 the team had the twelfth-best record among all teams in Division I-A of the National Collegiate Athletic Association (NCAA). It won the national championship in 1990, finished first in the Big 8 Conference three times between 1989 and 1995, and was the Big 12 Conference champion in 2001.

As the report of a CU independent investigative commission (IIC Report) observed,[3] CU's success on the field has been partly the result of an effective

---

[3] The independent investigative commission was created by resolution of the Board of Regents, which directed it to investigate the use of sex and alcohol
(continued...)

-19-

recruiting program that attracts the attention of the country's elite high-school

football prospects. The NCAA, which closely regulates many aspects of the

recruiting process, allows schools like CU to bring up to 62 high-school-aged

prospects to campus each fall during football season. In the 1990s CU paired

each visiting recruit with an "Ambassador," usually female, who escorted the

recruit around campus throughout the visit. CU also matched recruits with

players selected by the coaching staff, including the head coach. Robert

Chichester, an attorney in the CU counsel's office and later associate athletic

director, said that the player-hosts, who were usually underclassmen, were chosen

because they knew how to "party" and how "to show recruits a good time," and

would "do a good job of entertaining [them]." Aplt. App. Vol. VI at 397 (Dep. of

Robert Chichester). One host put it:

> [T]he whole goal is to have . . . the top recruits come from all over
> the nation to come to your school, . . . because that's your—the
> future of the team. . . . [T]he position that we're placed in is that
> we're supposed to . . . take these recruits out, . . . show them a good

---

[3](...continued)
in CU football recruiting and provide a report to the Board. In the district court
Plaintiffs claimed that the IIC Report was admissible as nonhearsay under Fed. R.
Evid. 801(d)(2) or under a hearsay exception, Fed. R. Evid. 803(8). *Simpson*, 372
F. Supp. 2d at 1233. For purposes of summary judgment the district court
assumed that one of these arguments was correct. *Id.* On appeal CU makes the
blanket assertion, with no supporting citations or argument, that "[t]he IIC report
is inadmissible hearsay." Aplee. Br. at 57. We deem its argument waived on
appeal and decline to address it. *See Ambus v. Granite Bd. of Educ.*, 975 F.2d
1555, 1558 n.1 (10th Cir. 1992), *modified on other grounds on reh'g*, 995 F.2d
992 (10th Cir. 1993).

time, go out to dinner with them, . . . just have them interact with other athletes and just students in general.

Aplt. App. Vol. VII at 1343.

Plaintiffs were assaulted during a recruiting visit in December 2001. CU won the Big 12 Conference championship on December 1. High-school recruits visited campus a few days later. According to one recruit who was present at the assaults, on the night of Thursday, December 6, some of his fellow recruits had sex with female students in a room at a local hotel. He had stayed in his own room, but the next day he was assured by players that he could expect similar treatment that night and every weekend if he came to CU.

CU football players talked to a female CU student, who was a tutor for the athletic department, about getting together with her and other female students on Friday, December 7. At least one of the players understood that the purpose was to provide recruits another chance to have sex. The tutor, along with Ms. Gilmore, Ms. Simpson and others, had planned to spend the evening at Ms. Simpson's apartment. The tutor asked Ms. Simpson if four football players could come over later, and Ms. Simpson agreed. Between 11:30 and 11:45 p.m. about 20 football players and recruits arrived. Although some apparently left shortly after arriving, others remained. One player who was leaving was told by the tutor that he should stay because "it was about to go down," which he

understood to mean that the women would begin showing recruits a "good time." Aplt. App. Vol. VI at 459 (internal quotation marks omitted).

Within an hour or so Ms. Simpson, who was intoxicated, went to her bedroom to sleep. She awoke later to find two naked men removing her clothes. The door was locked. She was then sexually assaulted, both orally and vaginally, by recruits and players surrounding her bed. In the same room at the same time, two players and a third man, who was either a player or a recruit, were sexually engaged with Ms. Gilmore, who was too intoxicated to consent. Ms. Simpson and Ms. Gilmore were not the only females allegedly assaulted that night; three other women were sexually harassed by players in the apartment and a fourth had nonconsensual sex with two players after leaving the apartment. Ms. Simpson later withdrew from CU, and Ms. Gilmore eventually left Colorado for a year.

The central question in this case is whether the risk of such an assault during recruiting visits was obvious. In our view, the evidence could support such a finding.

The association of sexual misconduct with college football programs had been a matter of widespread reporting and concern for many years. The Women's Sports Foundation, amicus curiae in this appeal, has pointed to at least 14 articles addressing the topic in various mainstream news publications between 1983 and Plaintiffs' assaults. There were also a number of articles in the *Chronicle of Higher Education*, including at least one expressly noting the risk of sexual

misconduct in connection with recruiting. Academic research in the early 1990s concluded that male student athletes were more prone to commit sexual assault than other male students. CU's 2001 handbook for football players contains the following paragraph:

> A recent three-year study conducted by the National Institute of Mental Health found that athletes participated in one-third of the 862 sexual attacks on college campuses. Another study conducted at Towson State University's Center for the Study and Prevention of Campus Violence found that athletes are 5.5 times more likely to commit date rape.

Aplt. App. Vol. II at 627.

CU itself was a specific focus of concern. A 1989 *Sports Illustrated* article on unlawful conduct by CU football players reported a number of cases of sexual assault by the players. One passage stated that the head football coach at the time, Bill McCartney,

> sometimes doesn't seem to grasp the seriousness of the situation either. . . . [H]e told [a television reporter], "Rape by definition is a violent act; an act whereby there's real physical violence involved, and so I don't think that's what we're talking about here." Said Boulder district attorney Alex Hunter, "It's obvious to me that one more spot in that date-rape seminar should be reserved for the football coach."

Rick Reilly, *What Price Glory?* Sports Illustrated, Feb. 27, 1989, at 32. In 1990 two CU football players were charged with rape and sexual assault arising from separate incidents.

The CU recruiting program was implicated in such misconduct in 1997, when Rick Neuheisel was head coach. As the IIC Report detailed, on December 6 a group of high-school girls attended a party at an off-campus hotel hosted by a CU football player for two visiting recruits. One of the girls alleged that she had been sexually assaulted by recruits at the party. Although the victim was not a CU student protected by Title IX, that circumstance is irrelevant to evaluation of the risk to CU women.

In January 1998 CU Chancellor Richard Byyny learned that Boulder police were investigating the incident. He emailed Athletic Director Richard Tharp:

> I worry about the oversight we have of the recruits while they are in our charge. Allegedly the recruits were all drinking beer in their rooms. I realize we don't have control over immature potential students. However, we should clearly spell out our rules, responsibilities, and expectations.

Aplt. App. Vol. II at 320 (IIC Report) (internal quotation marks omitted).

After the incident came to the attention of Boulder County District Attorney Alex Hunter, he requested a meeting with CU officials. On February 18, 1998, Hunter and Assistant District Attorneys Peter Hofstrom and Mary Keenan met with Byyny, Tharp, and Chichester, who was working in CU's counsel's office. Byyny understood that the purpose of the meeting was to provide the DA's office with an opportunity to "ask [CU] to continue to try and help educate [its] students, make sure that [the] students and [the] coaches were well informed about University policies and expectations in order to work to prevent these . . .

-24-

kinds of events from occurring." Aplt. App. Vol. VI at 404 (Dep. of Richard Byyny).

At the meeting Keenan, who later became DA, said that she was concerned about women being made available to recruits for sex. She explained that a girl in the position of the high-school victim, who was drunk at the time, would have sex with football recruits, "whether consensual or nonconsensual." *Id.* at 426 (Notes of Mary Jo White). She asserted that the 1997 assault wasn't "isolated" and indicated a "*real* problem" from which people at CU were "turn[ing their] heads." *Id.* at 410 (Notes of Robert Chichester). According to Keenan, she recommended that CU adopt a policy of zero tolerance for alcohol and sex in the recruiting program, develop written policies and procedures for supervising recruits, and offer football players annual training by the DA on sexual assault. She told Tharp "that [he] need[ed] to take measures to prevent this because if it happens again, [the DA's office is] going to deal with it very seriously." *Id.* at 420 (Dep. of Mary Keenan). CU was now, as she put it at the time, "on notice." *Id.*

Hunter also emphasized the changes that he thought needed to be made in the CU football recruiting program. The most important was that the player-hosts needed to be instructed on what was and was not appropriate conduct. Furthermore, the head coach needed to be tougher with athletes, and the coaching

staff needed to explain clearly what conduct was appropriate for player-hosts and others.

The parties dispute the vigor of CU's response after the meeting. CU claims that it made significant policy revisions, but Plaintiffs have questioned whether these revisions were actually aimed at remedying or correcting the problem. CU's primary response was not admitting the two recruits involved in the assault and suspending the player for a semester. In addition, in April 1998 Chancellor Byyny instructed Athletic Director Tharp to develop new policies on student-athlete behavior, including a zero-tolerance rule on activities threatening the health or safety of student-athletes and others. Tharp responded that new policies would be drafted, but he expressed concern that new policies—apparently including the zero-tolerance policy—would impose a higher standard upon student-athletes than other students. As Tharp acknowledged in his deposition, none of the eventual recruiting or policy changes—the most substantive of which was apparently a ban on alcohol or tobacco for recruits—addressed either sexual contact between recruits and females or the responsibilities of player-hosts (other than a general statement that student-athletes should comply with Colorado law). Furthermore, although CU adopted a revised sexual-harassment policy in 1998, it applied equally to everyone on campus. It included nothing specific to recruiting or athletics, and although Tharp had been involved in drafting the policy in 1995 and 1996, he admitted that he played no role in its development after December

1997, when the assault occurred. As for the recommendations by prosecutors Hunter and Keenan, "no changes . . . were apparent" to Chichester following the meeting. *Id.* at 397.

New head coach Gary Barnett arrived at CU in 1999. Deposition testimony of three players suggests that player-hosts still received little or no direction on appropriate behavior or responsibilities. One player testified that he had been told that his responsibilities as a player-host were to "[s]how [the recruits] around," and that "[t]hey really don't go into detail [regarding] your responsibilit[ies]." *Id.* at 448. Barnett, who had learned from Chichester about the 1997 assault and subsequent meeting with the DA, began distributing a football handbook that included one page (of 88) addressing "Date Rape and Social Policy," Aplt. App. Vol. II at 627. The page warned players "not [to] put [themselves] in a position to lose everything [they] ha[d] worked hard for by committing a sexually aggressive act." *Id.* It cautioned that "NO means NO; even if you think she means yes"; "[a] girl never owes you sex"; and "[n]ever initiate intercourse if the woman is intoxicated or passed out." *Id.* There is evidence that coaches or senior players reviewed at least some of the information in the handbook with players during training camp. The handbook does not, however, address the risk of sexual assault or harassment in the recruiting program, and does not provide guidance to player-hosts on appropriate behavior by themselves and recruits. The only pages to address recruiting provided basic

instructions on the use of a $30 stipend provided by CU to hosts for entertainment of recruits.

Whatever Barnett did, it apparently did not straighten out the recruiting program. One recruit—who was later persuaded to come to CU and was one of the players present the night of Plaintiffs' assaults—stated that he was offered marijuana and alcohol and taken to a strip club during his 1999 recruiting visit. Afterwards he told Barnett that he did not want to accept CU's offer because of what he had seen on campus, although he refused Barnett's request to go into detail. When an assistant coach later followed up with him, he told the coach about the marijuana use, but did not mention the strippers.

Moreover, there were other signs that guidance of players regarding sexual harassment (including assault) had proved inadequate. In either 1999 or 2000, Dr. David Hnida, the father of Katharine Hnida, a female player on the CU football team, repeatedly told Barnett and Athletic Director Tharp "about multiple instances of sexual harassment of [his] daughter by CU football players, which the coaching staff had allowed to continue." *Id.* at 463 (Aff. of David Hnida). When Ms. Hnida made additional complaints about harassment, Barnett and Tharp retaliated against her by preventing her from staying on the football team and interfered with her playing elsewhere.

More importantly, in late September 2001, about two months before Plaintiffs' assaults, a female student employed in the athletic department, Trainer

-28-

A, was raped by a CU football player. Trainer A met with Barnett shortly after the rape. Barnett twice asked her if she planned to press charges, and she told him that she wasn't sure. He then told her that if she did, her "life would change," Aplt. App. Vol. VI at 467 (Aff. of Trainer A), and that if the player had a different version of what happened, "he would support the player," *id.* at 468. She alleged that when she asked Barnett what he would do about the player, he responded that "he was the player's coach and not his father and that he would not punish him." *Id.* at 467. Trainer A ultimately decided not to press charges because of her conversation with Barnett. Barnett testified that the player was ordered to do some extra running, but he could not recall the specifics. Also, the player wrote a letter of apology.

In addition to the evidence that Barnett knew that efforts by CU were not effective in establishing a football-team culture that would prevent sexual assaults, there was also evidence that those efforts were being undermined by Barnett himself. We have already noted the evidence of his hostility to those alleging sexual harassment (David and Katharine Hnida) or sexual assault (Trainer A). And in 2001 Barnett hired as an assistant football coach a former football player who had been accused of assaulting a woman a few years earlier and had been banned from the CU campus.

CU contends that evidence of its conduct after the assaults on Plaintiffs is irrelevant. But the reaction by Barnett and other officials to Plaintiffs'

-29-

allegations indicates an attitude that would be inconsistent with their having made any sincere effort in the past to instruct players not to engage in or promote sexual harassment or assault. After Ms. Simpson reported her assault to police, CU revoked spring-semester scholarships for four football players who were allegedly involved but did not deny eligibility to those players for the January 2002 Fiesta Bowl, where CU had a chance to win the national championship. Although CU did not admit that year two recruits who were implicated in the assaults, Coach Barnett acknowledges that after the assaults he continued to support admission for one of the recruits despite being told that evidence of his involvement in the assaults was "overwhelming." *Id.* at 475. There is also evidence that the CU police officer who served as Coach Barnett's personal escort at football games obstructed the investigation into Plaintiffs' assaults by meeting with football players before the investigating officers could. An assistant coach told players to copy a videotape before giving it to police officers who had requested it as part of their investigation into the assaults. And a female student-athlete had her scholarship terminated and was "excluded by athletic department staff, without explanation, from athletic facilities and benefits" after she told police what she saw at Ms. Simpson's apartment on December 7. Aplt. App. Vol. II at 701 (Aff. of student).

Barnett and Tharp also continued to resist recruiting reforms. Barnett told Chichester that he thought that female students may have arranged for the events

of December 7, effectively setting up the recruits. He claimed that at schools all over the country recruits were shown "a good time," met young women, and went to parties, and if such activities weren't allowed at CU, it would be a "competitive disadvantage" for the football team. Aplt. App. Vol. VI at 395.

As for Tharp, in April 2002 Chancellor Byyny directed him to institute a number of recruiting changes, including requiring only "well-trained upperclassmen" to serve as recruiting hosts. Aplt. App. Vol. II at 324 (IIC Report) (internal quotation marks omitted). Although Tharp made some changes, he resisted the order to limit hosts to upperclassmen. The record does not appear to indicate whether or when such a requirement was instituted, although CU eliminated the player-host program entirely by the 2004–2005 recruiting season.

In sum, the evidence before the district court would support findings that by the time of the assaults on Plaintiffs, (1) Coach Barnett, whose rank in the CU hierarchy was comparable to that of a police chief in a municipal government, had general knowledge of the serious risk of sexual harassment and assault during college-football recruiting efforts; (2) Barnett knew that such assaults had indeed occurred during CU recruiting visits; (3) Barnett nevertheless maintained an unsupervised player-host program to show high-school recruits "a good time"; and (4) Barnett knew, both because of incidents reported to him and because of his own unsupportive attitude, that there had been no change in atmosphere since 1997 (when the prior assault occurred) that would make such misconduct less

-31-

likely in 2001. A jury could infer that "the need for more or different training [of player-hosts was] so obvious, and the inadequacy so likely to result in [Title IX violations], that [Coach Barnett could] reasonably be said to have been deliberately indifferent to the need." *Canton*, 489 U.S. at 390.

In light of the summary-judgment standard, and taking into account all favorable inferences for Plaintiffs, *see Escue*, 450 F.3d at 1152, we conclude that they submitted sufficient evidence for "a reasonable jury [to] return a verdict for [them]," *Bingaman*, 1 F.3d at 981 (internal quotation marks omitted). Summary judgment was therefore inappropriate.

## III.  CONCLUSION

We REVERSE the grant of summary judgment to CU and REMAND for further proceedings consistent with this opinion.