FILED
United States Court of Appeals
Tenth Circuit

September 2, 2014

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

SCOTTSDALE INSURANCE
COMPANY,

      Plaintiff-Appellant,

v.

NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA,

      Defendant-Appellee.

No. 12-1513
(D.C. No. 1:10-CV-01092-RPM)
(D. Colo.)

---

**ORDER AND JUDGMENT**[*]

---

Before **MATHESON**, **MCKAY**, and **EBEL**, Circuit Judges.

---

Plaintiff-Appellant Scottsdale Insurance Company (Scottsdale) and Defendant-

Appellee National Union Fire Insurance Company of Pittsburgh, PA, (National Union),

two excess liability insurers, disagree over National Union's obligation to reimburse

Scottsdale for any of the $4.35 million that Scottsdale paid to cover the settlement of

claims against their common insured general contractor, Northwest Construction

---

      [*]This order and judgment is not binding precedent, except under the doctrines of
law of the case, res judicata, and collateral estoppel.  It may be cited, however, for its
persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Company (Northwest). The ability of Scottsdale to obtain reimbursement from National Union turns on whether the primary policy underlying the excess insurance provided by National Union's excess policy had been "exhausted." The district court granted summary judgment to National Union because Scottsdale did not provide sufficient evidence to show that the primary policy underlying National Union's excess coverage was exhausted. We agree with the district court and affirm.

## I.

Viewed in a light most favorable to the non-moving party, Scottsdale, the facts are as follows.

Northwest was the general contractor on the Coyote Ranch Apartments project in Arapahoe County, Colorado, constructed over the years 2001 to 2004. Scottsdale and National Union provided consecutive excess insurance policies to Northwest: Scottsdale from April 2002 to April 2003 for $10 million and National Union from April 2003 to April 2004 for $5 million and from April 2004 to April 2005 for $10 million.[1] A primary insurance policy underlay each excess policy: a Transcontinental Commercial General Liability (Transcontinental) policy from April 2002 to April 2003, a Valley Forge Commercial General Liability (Valley Forge) policy from April 2003 to April 2004, and an American Zurich Insurance Company (Zurich) policy from April 2004 to April 2005.

---

[1] An "excess" or "umbrella" insurance policy is a policy that only pays out if the primary insurance policies underlying it are exhausted—that is, if the coverage limits for the types of liabilities covered during the time period for the primary policy are satisfied.

Transcontinental and Valley Forge are both owned by CNA Financial Corporation (CNA). All of these primary policies had a coverage limit of $1 million for each occurrence and a $2 million general aggregate limit.

Construction flaws in the Coyote Ranch Apartments project became apparent in 2002 while construction remained ongoing. In 2003, Northwest and others were sued in Colorado state court by the owners of the project, Simpson Cherry Creek Limited Partnership (the Simpson suit). As the policies issued through Transcontinental and Valley Forge provided primary coverage during construction, CNA provided a defense to the Simpson suit, pursuant to a full reservation of rights. While the Simpson suit was ongoing, Transcontinental and Valley Forge brought a declaratory judgment action against Northwest and its associates in the United States District Court for the Northern District of Texas, claiming their policies contained an exclusion that relieved them of the duty to insure construction claims on the Coyote Ranch Apartment project.[2]

The parties to the Simpson suit settled that suit in 2008 for $8.5 million. The Simpson suit parties agreed that the Transcontinental and Valley Forge policies would pay out $2 million each, Scottsdale would pay $4.35 million, and Zurich and Northwest would each pay $75,000. National Union contributed nothing to the settlement.

In a related agreement (the Declaratory Judgment Agreement), Northwest, Scottsdale, and CNA agreed that Scottsdale would pay $500,000 to CNA to facilitate the

---

[2] Such an exclusion in the primary coverage would render the excess carriers liable for coverage if the excess policy covered the construction claims at issue.

3

resolution of a Declaratory Judgment action in the Northern District of Texas. Northwest agreed that "payment by Scottsdale to CNA in the amount of $500,000 as reallocation of their respective shares of the Settlement Amount for the Underlying Action [the Simpson suit] further reduces the limits of liability of the Scottsdale Policy." (R. Aplt. App. at 65, ¶6.)  These three parties also agreed that Transcontinental and Valley Forge had exhausted their limits of insurance with respect to Northwest. Further, the parties agreed that any amounts recovered from National Union would replenish the limits of insurance for the Valley Forge and Transcontinental policies.

In 2010, Scottsdale sued National Union for at least $2,283,911 under theories of equitable judgment regarding coverage, equitable contribution, contractual subrogation, and equitable subrogation.[3] The district court granted summary judgment to National Union because Scottsdale did not bring forth sufficient evidence to meet its burden to prove exhaustion of the primary policies underlying National Union's excess policy exposure. Scottsdale appeals.

## II.

### A. Standard of Review

"We review the district court's order granting summary judgment de novo." Koessel v. Sublette Cnty. Sheriff's Dep't, 717 F.3d 736, 742 (10th Cir. 2013). Summary judgment is available if "there is no genuine dispute as to any material fact and the

---

[3] At the district court, the parties agreed that Texas law applies to this dispute.

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "There is no genuine issue of material fact unless the evidence, construed in the light most favorable to the non-moving party, is such that a reasonable jury could return a verdict for the non-moving party." Koessel, 717 F.3d at 742. In order to survive summary judgment, "[f]or dispositive issues on which the plaintiff will bear the burden of proof at trial, he must go beyond the pleadings and designate specific facts so as to make a showing sufficient to establish the existence of an element essential to his case . . . ." Cardoso v. Calbone, 490 F.3d 1194, 1197 (10th Cir. 2007) (alterations omitted) (internal quotation marks omitted). The nonmovant must "do more than simply show that there is some metaphysical doubt as to the material facts." Champagne Metals v. Ken-Mac Metals, Inc., 458 F.3d 1073, 1084 (10th Cir. 2006). The relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Simpson v. Univ. of Colo. Boulder, 500 F.3d 1170, 1179 (10th Cir. 2007).

Here, it was up to Scottsdale to bring forth evidence such that a reasonable jury could find for it because under Texas law, the insured "must prove the exhaustion of underlying insurance as a condition precedent to recovery against the excess carrier," and Scottsdale is stepping into the shoes of the insured attempting to show that National Union must provide excess coverage. Dresser Indus., Inc. v. Underwriters at Lloyd's, London, 106 S.W.3d 767, 771 (Tex. App. 2003). See also D.R. Horton, Inc. v. Am. Guarantee & Liab. Ins. Co., 864 F. Supp. 2d 541, 564 (N.D. Tex. 2012), appeal dismissed

5

(Oct. 22, 2012) ("[T]he court is satisfied that in order to carry its burden under Texas law to establish a payment obligation under defendant's policy for any property damage that took place . . . [plaintiffs] had the burden to establish that the limits of liability of the [primary policies] had been exhausted by payment of claims covered by those policies during that policy year.").

On appeal, the parties dispute whether "horizontal exhaustion" or "vertical exhaustion" applies. "'Horizontal exhaustion' means that each primary insurance triggered by a continuous loss must indemnify the policyholder to the full extent of its policy limits before any excess insurer can be required to pay." LSG Techs., Inc. v. U.S. Fire Ins. Co., No. 2:07-CV-399-DE, 2010 WL 5646054 at *10 (E.D. Tex. Sept. 2, 2010) (unpublished decision) (citing 23–145 Appleman on Insurance § 145.4; Thomas M. Jones, An Introduction to Insurance Allocation Issues in Multiple Trigger Cases, 10 Vill. Envtl. L.J. 25, 33 (1999)). On the other hand, "vertical exhaustion provides that each excess policy in a triggered year is required to contribute to indemnification as soon as its particular underlying coverage is exhausted, even if other triggered primary policies (covering other periods) remain 'untapped.'" Id. (citing 23–145 Appleman on Insurance § 145.4). We need not decide which exhaustion applies because with Zurich's mere $75,000 payment, Scottsdale cannot show either horizontal exhaustion, and it likewise cannot show vertical exhaustion because it has failed to show exhaustion of the primary policy underlying National Union's '03-'04 excess policy.

**B. Scottsdale's evidence to avoid summary judgment**

This case's resolution is straightforward. Although Scottsdale showed convincing evidence of its own intentions, it showed no evidence of CNA's intentions or evidence from CNA's perspective about how the $500,000 Declaratory Judgment Agreement payment from Scottsdale was to be applied or distributed, and thus, Scottsdale can make no showing of vertical exhaustion of the primary policy underlying National Union's excess coverage policy. Without any limitation in the settlement agreements on CNA and absent evidence about CNA's intentions, CNA could have applied this $500,000 in any number of ways. Scottsdale easily could have prevented such a state of affairs. First, it could have negotiated the Declaratory Judgment Agreement to provide that CNA would not apply the $500,000 to the '03-'04 policy. Second, it could have discovered in litigation what CNA did with the $500,000 and presented that information to the district court. Scottsdale did neither; it has no other evidence to create a genuine issue of material fact; and consequently it cannot survive summary judgment.

Scottsdale nevertheless contends that it has presented four pieces of evidence that show a genuine dispute of material fact. It first points to the deposition of Stephanie Petras, a Scottsdale representative who participated in the negotiations that led to the Declaratory Judgment Agreement, who testified:

> Q:          . . . But just so that we're clear, the—the—when you're talking about the declaratory judgment action that CNA had filed, it wasn't just on the '02, '03 policy.

[Petras]:     I understand that. But our risk and our agreement to resolve the issue was on the—was based on the '02, '03 residential exclusion because that's where Scottsdale's policy sat.

(R. Aplt. App. at 62.) Scottsdale concludes from this statement that the payment was only applicable to the CNA '02-'03 Transcontinental policy, i.e. if it "replenished" any policy at all, it only replenished the '02-'03 Transcontinental policy. This deposition, however, fails to solve Scottsdale's evidentiary problem. The deposition evidence about Scottsdale's pecuniary motivation for its payment to CNA does not provide any information about how CNA allocated the $500,000 between the policies or elsewhere, nor does it control CNA's actions. Without any evidence, the $500,000 could fairly be said to have replenished either or both CNA policies because it was paid to CNA without restriction.

Second, Scottsdale makes arguments about the nature of the Declaratory Judgment Agreement. Scottsdale first states that agreement reduced Scottsdale's limits of insurance by $500,000 and provided that replenishment of '02-'03 and '03-'04 CNA policies would result from a recovery from National Union. Scottsdale thus concludes that any money paid by Scottsdale to CNA cannot replenish the '03-'04 CNA policy underlying National Union's policy. However, this off-point language about recoveries from National Union going to replenish the CNA policies' limits and the lack of such direct language with respect to the $500,000 do not impose any limits to replenishment from the $500,000 that would bind CNA. Scottsdale further claims that National Union and the District Court

8

failed to specify the provision of the Declaratory Judgment Agreement that required or even provided for replenishment of the policy underlying National Union's excess policy. Scottsdale points this court to the language stating that monies recovered from National Union would replenish CNA's limits of insurance and that no such language existed about the $500,000 payment from Scottsdale. Scottsdale contends that this discrepancy indicates that the $500,000 in question could not have gone to replenish the CNA policy underlying National Union's policy. But in demanding that National Union identify the Declaratory Judgment Agreement provision that provided for replenishment of the CNA policy underlying National Union's policy, Scottsdale attempted to shift the burden to prove exhaustion of the '03-'04 CNA policy to National Union when it is Scottsdale that bears that burden.

Third, Scottsdale argues that a plain reading of its policy provisions leads to the conclusion that Scottsdale was only responsible for occurrences of damage within its April '02-April '03 policy period. Scottsdale contends that because it only intended to settle the declaratory judgment action to protect itself from a risk that it would have to pay out under its '02-'03 excess policy, a reasonable jury could find that the $500,000 payment to CNA did not apply to the '03-'04 CNA policy underlying National Union's policy. However, the character of Scottsdale's liability under its policy and the limits to liability to the '02-'03 year does not change the fact that Scottsdale paid CNA in an agreement without specifying any limit on the $500,000 going to replenish CNA's '03-'04 policy.

9

Fourth, Scottsdale contends that the $500,000 payment could only have replenished the CNA policy underlying Scottsdale's claim because the only viable claim in the declaratory judgment action was the apartment building exclusion in the CNA '02-'03 policy underlying Scottsdale's excess policy. According to Scottsdale, if solely the '02-'03 declaratory judgment claims had merit, then the payment of $500,000 could not be applied to replenish the '03-'04 policy underlying National Union. This argument ignores that the merits of the declaratory judgment action do not bear on the Scottsdale's ability to prove that the '03-'04 policy was exhausted in light of the $500,000 payment to CNA without conditions attached.

## CONCLUSION

Without evidence showing any limitation of CNA's treatment of the $500,000 payment—either from the Declaratory Judgment Agreement or from CNA itself—there is insufficient evidence for Scottsdale to avoid summary judgment. We thus affirm the district court's grant of summary judgment.

ENTERED FOR THE COURT


David M. Ebel
Circuit Judge

10