**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

AREZOU MANSOURIAN; LAUREN
MANCUSO; CHRISTINE WING-SI NG,
          *Plaintiffs-Appellants,*

                    v.

REGENTS OF THE UNIVERSITY OF
CALIFORNIA, UNIVERSITY OF
CALIFORNIA AT DAVIS; LAWRENCE
VANDERHOEF; GREG WARZECKA;
PAM GILL-FISHER; LAWRENCE
SWANSON,
          *Defendants-Appellees.*

No. 08-16330

D.C. No.
2:03-cv-02591-
FCD-EFB

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the Eastern District of California
Frank C. Damrell, District Judge, Presiding

Argued and Submitted
October 8, 2009—San Francisco, California

Filed February 8, 2010
Amended April 20, 2010

Before: Mary M. Schroeder and Marsha S. Berzon,
Circuit Judges, and Milton I. Shadur,* District Judge.

Opinion by Judge Berzon

---

*The Honorable Milton I. Shadur, Senior United States District Judge
for the Northern District of Illinois, sitting by designation.

5813

## COUNSEL

Noreen Farrell (argued), Debra Smith, James C. Sturdevant, Monique Olivier, San Francisco, California; Kristen Galles, Alexandria, Virginia, for plaintiffs-appellants Arezou Mansourian, Lauren Mancuso, and Christine Wing-Si Ng.

Nancy J. Sheehan, Sacramento, California, for defendants-appellees Regents of the University of California et al.

## ORDER

The opinion filed on February 8, 2010, is hereby amended. The amended opinion is attached hereto. With this amendment, Judges Schroeder and Berzon have voted to deny the petition for rehearing and to reject the suggestion for rehearing en banc, and Judge Shadur so recommends.

The full court has been advised of the suggestion for rehearing en banc and no active judge has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35.

The petition for rehearing is DENIED and the suggestion for rehearing en banc is REJECTED. No future petitions for rehearing will be entertained.

---

## OPINION

BERZON, Circuit Judge:

The statute known as Title IX, 20 U.S.C. § 1681, is widely recognized as the source of a vast expansion of athletic opportunities for women in the nation's schools and universities, so much so that a company that sells women's athletic apparel now mimics its name. *See* www.titlenine.com. Despite that renown, the district court in this case held that a university that receives federal funds cannot be held liable in damages for failing effectively to accommodate the athletic interests of both men and women unless the aggrieved women first provide the appropriate university officials with notice of their disadvantageous treatment and an opportunity to cure it.

We disagree and so, with respect to the central issue in this case, reverse the district court's grant of summary judgment on that ground. We hold as well that the defendant university is not entitled to summary judgment on the alternative ground

that it has complied with Title IX. We also reverse the order dismissing the plaintiffs' equal protection claim and remand for further proceedings consistent with this opinion.

## FACTUAL AND PROCEDURAL BACKGROUND

Arezou Mansourian, Lauren Mancuso, and Christine Wing-Si Ng (hereafter plaintiffs or students) are women who wrestled in high school and chose to attend the University of California, Davis (UCD) so they could participate in the university's acclaimed wrestling program, which had long provided opportunities for women.[1] The plaintiffs participated in varsity wrestling and enjoyed the benefits associated with varsity status: training, coaching, and laundry services; academic tutoring; insurance; and access to varsity facilities and equipment.[2] UCD did not operate separate wrestling teams for men and women; a handful of women wrestlers participated in what was largely a men's team, practicing with the men and receiving coaching from Coach Mike Burch.

During the 2000-2001 academic year, UCD eliminated all women from the wrestling team. After the students protested to UCD administrators and filed a complaint with the Office for Civil Rights (OCR),[3] UCD agreed to permit women again

---

[1] Nancy Chiang, an additional plaintiff named in the complaint, was on a leave of absence from UCD when the complaint was filed. She dismissed her claims in June 2007. Mansourian, Ng, and Mancuso graduated from UCD during the course of the litigation.

[2] UCD disputes the very existence of a women's varsity wrestling program, insisting that the plaintiffs were merely "permitted to practice with the wrestling team." UCD acknowledges, however, that the plaintiffs "participated in wrestling" and that Mansourian, at least, was "on the wrestling team roster" and received varsity-associated benefits. Moreover, UCD listed four female varsity wrestlers in its 1999-2000 athletics report pursuant to the Equity in Athletics Disclosure Act, 20 U.S.C. § 1092(g). Viewing the facts in favor of the plaintiffs on UCD's motion for summary judgment, we conclude that the plaintiffs were varsity wrestlers for purposes of Title IX.

[3] OCR is the division of the United States Department of Education charged with enforcing Title IX.

to participate in varsity wrestling. Their participation, however, was conditioned on their ability to beat male wrestlers in their weight class, using men's collegiate wrestling rules. (Prior to their elimination from the team, women wrestlers at UCD had competed only against other women and used international freestyle rules.) As a result of the new requirement that they compete against men under men's rules, the female students were unable to participate on the wrestling team and lost the benefits associated with varsity status, including scholarships and academic credit.

The students then filed a class action against UCD and several UCD officials in their individual and official capacities, on behalf of all current and future female UCD students denied equal athletic participation opportunities. The plaintiffs sought damages and injunctive relief under Title IX and also asserted equal protection claims under 42 U.S.C. § 1983.[4]

Just before the scheduled hearing on class certification, the plaintiffs requested a stay due to their attorney's serious illness. During the ten-month stay, Mancuso, the only named plaintiff still attending UCD at that point, graduated. As soon as the stay ended, the plaintiffs moved to add as plaintiffs three students, Kelsey Brust, Laura Ludwig, and Jessica Bulala, all still enrolled at UCD. The district court refused to allow the amendment, holding that the plaintiffs failed to meet the good cause required under Federal Rule of Civil Procedure 16 when such a motion is filed after the issuance of a scheduling order. *See Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 607-08 (9th Cir. 1992). Without any named plaintiffs currently attending UCD, the plaintiffs stipulated to dismissal of the class claims for injunctive relief.

---

[4]The Title IX claims are asserted only against the university. The individual defendants are Larry Vanderhoef, University Chancellor; Greg Warzecka, Athletic Director; Pam Gill-Fisher and Lawrence Swanson, Associate Athletic Directors; and Robert Franks, Associate Vice Chancellor for Student Affairs. We refer to the individual defendants and the University collectively as "UCD."

The district court subsequently dismissed the § 1983 claim as "subsumed" by the Title IX claim, citing *Middlesex County Sewer Authority v. National Sea Clammers Ass'n.*, 453 U.S. 1 (1981). The district court then granted UCD's motion for summary judgment, holding that the students were required, to perfect their claim, to give UCD notice in advance of filing suit of the alleged Title IX violation and an opportunity to cure it, and had failed to do so. The students timely appealed.

## ANALYSIS

We review de novo the district court's dismissal on the pleadings pursuant to Rule 12(c), *Dunlap v. Credit Protection Ass'n, L.P.*, 419 F.3d 1011, 1012 n.1 (9th Cir. 2005), as well as the grant of summary judgment. *Avista Corp. Inc. v. Wolfe*, 549 F.3d 1239, 1246 (9th Cir. 2008). We review the denial of a motion to amend under Rule 16(b) for abuse of discretion. *Noyes v. Kelly Servs.*, 488 F.3d 1163, 1174 n.6 (9th Cir. 2006).

Before proceeding to discuss the merits of this case, we consider whether we have jurisdiction to decide the plaintiffs' challenge to the district court's denial of their motion to add Brust, Bulala, and Ludwig as plaintiffs. We hold that this issue is moot and so beyond our jurisdiction, for the reasons we now explain.

**[1]** After the district court denied the motion, Brust, Bulala, and Ludwig initiated a separate lawsuit against UCD. The district court certified a class of "[a]ll present, prospective, and future women students at [UCD] who seek to participate in and/or who are deterred from participating in intercollegiate athletics at [UCD]." Stipulated Judgment and Order at 1, *Brust v. Regents of the Univ. of Cal.*, No. 07-1488 (E.D. Cal. Oct. 19, 2009). The parties to the *Brust* action reached a settlement, approved by the district court, which "resolves all class member claims for injunctive relief." *Id*. at 10. Moreover, Brust, Ludwig, and Bulala have now graduated

from UCD. It is therefore apparent that, even if the district court had erred in denying the motion to add Brust, Ludwig, and Bulala initially, which we do not decide, they would no longer be appropriate plaintiffs in this litigation for the purposes of injunctive relief, as the current plaintiffs recognize. *See Flint v. Dennison*, 488 F.3d 816, 824 (9th Cir. 2007) ("Generally, once a student graduates, he no longer has a live case or controversy justifying declaratory and injunctive relief against a school's action or policy, and his case is therefore moot."); *Cole v. Oroville Union High Sch*, 228 F.3d 1092, 1099 (9th Cir. 2000) (holding, where the two original plaintiffs had graduated and a third, later-joined plaintiff subsequently graduated before the appeal, that all three lacked standing to seek injunctive relief).

The plaintiffs contend, however, that the *Brust* settlement does not preclude current female students from seeking the specific injunctive relief — not awarded as part of the *Brust* settlement — of restoring the women's wrestling program. That may be so; we need not decide whether it is or not. There are no current students in this case seeking that relief; no identified, current students looking to intervene in this case to seek that relief; and no identified, current students whom the plaintiffs seek to add to the case for purposes of obtaining that relief.

**[2]** We therefore may not reach the merits of the claim that the district court improperly denied the motion to add new plaintiffs, as there is presently no cognizable dispute that would be affected by such a determination.[5] *See, e.g.*, *McQuil-*

---

[5]The parties did not inform this court before oral argument that (1) the putative additional plaintiffs had also all graduated and (2) those plaintiffs had settled their separate lawsuit for class injunctive relief and were awaiting approval of that settlement by the district court. We as judges take our responsibilities seriously, preparing carefully before argument on all issues presented in the briefs. Where, as here, the complexion of the case has entirely changed while the appeal is pending, counsel for both parties

*lion v. Schwarzenegger*, 369 F.3d 1091, 1095 (9th Cir. 2004) (holding that a prisoner's successful habeas petition and subsequent relief rendered moot his claim for injunctive and declaratory relief under § 1983); *Porter v. Jones*, 319 F.3d 483, 489 (9th Cir. 2003) (noting that a case or issue becomes moot when "the parties lack a legally cognizable interest in the outcome" (quotation omitted)); *Di Giorgio v. Lee (In re Di Giorgio)*, 134 F.3d 971, 974 (9th Cir. 1998) (holding that tenants' challenge to a state statute permitting their eviction was moot after they voluntarily vacated the property).

**[3]** Turning to the merits of the students' damages claims, we begin by setting out the statutory and regulatory framework governing Title IX athletics cases. Title IX provides that

> [n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

20 U.S.C. § 1681(a). As applied to intercollegiate athletics, the Department of Education's Title IX regulations interpret the statute as requiring funding recipients to "provide equal athletic opportunity for members of both sexes." 34 C.F.R. § 106.41(c).[6]

---

have an obligation to so inform the court. That is so even if a party believes it has a basis for arguing that the issue should still be decided.

No such notice of changed circumstances was given here. Instead, the panel learned only at argument that Brust, Ludwig, and Bulala had graduated, and learned only after independent post-argument research that there was a motion pending, to be heard in a matter of days, for approval of a settlement for broad-ranging injunctive relief in the *Brust* litigation.

[6]The existence of a private right of action to enforce Title IX is well-established and not at issue in this case. *See Cannon v. Univ. of Chicago*, 441 U.S. 677 (1979).

**[4]** The regulations establish two components of Title IX's equal athletic opportunity requirement: "effective accommodation" and "equal treatment." "Effective accommodation" Title IX requirements derive from the Title IX regulation at 34 C.F.R. § 106.41(c)(1), which bases Title IX compliance in part on whether "the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes."[7] The "equal treatment" Title IX standard, in contrast, derives from 34 C.F.R. § 106.41(c)(2)-(10), which has been interpreted by OCR to require "equivalence in the availability, quality and kinds of other athletic benefits and opportunities provided male and female athletes."[8] Department of Education Office for Civil Rights, Clarification of Intercollegiate Athletics Policy Guidance: The Three-Part Test (Clarification) (1996), available at http://www.ed.gov/about/offices/list/ocr/docs/clarific.html. Effective accommodation claims thus concern the opportunity to participate in athletics, while equal treatment claims allege sex-based differences in the schedules, equipment, coaching, and other factors affecting participants in athletics. *See McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 299 (2d Cir. 2004) (holding that a competition schedule permitting male but not female

---

[7]"Effective accommodation" as a doctrine within Title IX jurisprudence is analytically distinct from similarly titled doctrines under other statutes — for example, the obligation to "mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability" under the Americans with Disabilities Act, 42 U.S.C. § 12112(b)(5).

[8]The regulation requires OCR to consider, in assessing whether equal opportunities are available to students of both sexes:

> The provision of equipment and supplies; [s]cheduling of games and practice time; [t]ravel and per diem allowance; [o]pportunity to receive coaching and academic tutoring; [a]ssignment and compensation of coaches and tutors; [p]rovision of locker rooms, practice and competitive facilities; [p]rovision of medical and training facilities and services; [p]rovision of housing and dining facilities and services; [p]ublicity.

34 C.F.R. § 106.41(c).

high school soccer players to participate in state and regional championships deprived female players of equal treatment under Title IX); *see also Pederson v. La. State Univ.*, 213 F.3d 858, 865 n.4 (5th Cir. 2000) (explaining the relationship between effective accommodation and equal treatment claims); *Boucher v. Syracuse Univ.*, 164 F.3d 113, 115 n.1 (2d Cir. 1999) (same). So "an institution may violate Title IX solely by failing to accommodate effectively the interests and abilities of student athletes of both sexes," even if the benefits provided athletes of both sexes are equivalent. *Kelley v. Bd. of Trs.*, 35 F.3d 265, 268 (7th Cir. 1994); *see also Roberts v. Colo. State Bd. of Agric.*, 998 F.2d 824, 828 (10th Cir. 1993); *Cohen v. Brown Univ.*, 991 F.2d 888, 897 (1st Cir. 1993).

Whether a funding recipient has met its "effective accommodation" obligation is determined using a "three-part test" drawn from OCR's 1979 Policy Interpretation, 44 Fed. Reg. 71,413 (Dec. 11, 1979), and further elaborated in OCR's 1996 Clarification.[9] Congress has specifically authorized OCR to promulgate regulations governing intercollegiate athletics,[10] *see* Pub. L. No. 93-380, § 844, 88 Stat. 612 (1974), and the resulting three-part test gives universities three options for demonstrating compliance with Title IX: (1) showing substantial proportionality (the number of women in intercollegiate athletics is proportionate to their enrollment); (2) proving that the institution has a "history and continuing practice of program expansion" for the underrepresented sex (in this case, women); or (3) where the university cannot satisfy either of

---

[9]We and other circuits have held that both the Policy Interpretation and the Clarification are entitled to deference under *Chevron U.S.A. v. Natural Res. Def. Council*, 467 U.S. 837, 843-44 (1984), and *Martin v. Occupational Safety & Health Review Comm'n*, 499 U.S. 144, 150 (1991). *See Neal v. Bd. of Trs.*, 198 F.3d 763, 770, 771 (9th Cir. 1999); *accord Chalenor v. Univ. of N.D.*, 291 F.3d 1042, 1047 (8th Cir. 2002); *Kelley*, 35 F.3d at 270-71; *Cohen*, 991 F.2d at 896-97.

[10]"Intercollegiate" refers to varsity and junior varsity teams, as opposed to club or intramural teams, which do not receive coaching or athletic scholarships and other benefits listed in the regulations. *See supra* note 8.

the first two options, establishing that it nonetheless "fully and effectively accommodate[s]" the interests of women. 44 Fed. Reg. 71,418.

[5] Funding recipients can satisfy any of the three options to comply with Title IX. UCD claims to have satisfied the second option by showing a history and continuing practice of program expansion.[11] Compliance with this option "focuses on whether an institution has expanded the number of inter-collegiate participation opportunities" for women, but provides institutions "flexibility in choosing which teams [they] add[ ]." Clarification nn. 2-3. The number of "participation opportunities" for women is defined by the number of female athletes who actually participate in varsity athletics, except that athletes who participate in more than one sport are counted as a participant for each sport they play.[12]

The district court determined that the plaintiffs had adequately pleaded a claim for effective accommodation under Title IX by alleging that UCD "chooses to make fewer athletic participation opportunities [available] to female students than to male students." The district court did not, however,

---

[11]The record does not demonstrate that UCD has complied with either Option One or Option Three, and UCD does not contend that it has.

[12]Some language in the Clarification suggests that the unduplicated count of female athletes is relevant in assessing Title IX compliance. For example, hypothetical Institution C and Institution E comply with Option Two because their "addition of teams resulted in an increased percentage of *women participating in varsity athletics*." But the Clarification elsewhere states that participation opportunities are the relevant metric, and that a student who plays two varsity sports represents two participation opportunities, so we assume that the sentence quoted means to refer to female participation opportunities, not individual women. Similarly, although this opinion sometimes for brevity refers to the number of "female athletes" at UCD for the purposes of Option Two compliance, we are always referring to participation opportunities, a number in which some female athletes count twice. We also count participation opportunities, not individuals, when comparing the number of "athletes" to overall student enrollment.

reach the merits of whether UCD complied with Option Two, instead concluding that "money damages cannot be awarded unless a plaintiff has given notice of and an opportunity to rectify the specific violation alleged by a Title IX plaintiff." Finding that the plaintiffs had failed to provide such notice, the district court granted summary judgment to UCD.

This circuit has yet to address whether any such requirement applies in the athletics context. We conclude that it does not.

**[6]** UCD's notice argument, adopted by the district court, proceeds by analogy to the Supreme Court's holding that notice and an opportunity to cure a violation is an essential precursor to a sexual harassment suit for damages under Title IX. We therefore begin by discussing the pertinent Title IX sexual harassment cases. As will appear, the analogy between this case and those is not apt.

The starting point for this inquiry is *Franklin v. Gwinnett County Public Schools*, 503 U.S. 60 (1992), in which the defendant school district was aware of a teacher's sexual harassment of a student but took no action to stop it. The Court recognized that *Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 28-29 (1981), precludes the award of damages for unintentional violations of statutes, like Title IX, enacted pursuant to Congress's spending authority. *See Franklin*, 503 U.S. at 74. *Franklin* held, however, that the failure to halt harassment of which a school district is aware constitutes intentional discrimination for which monetary damages are an appropriate remedy. *Id.* at 75-76.

*Gebser v. Lago Vista Independent School District*, 524 U.S. 274 (1998), further defined the scope of a school's monetary liability under Title IX for inaction in the face of serious sexual harassment. In *Gebser*, the Court held that principles of *respondeat superior* and constructive notice are inadequate to impose Title IX liability on a school district for a teacher's

sexual abuse of a high school student. *Id.* at 285. Noting that Title IX's express enforcement scheme, termination of federal funding, requires "an opportunity for voluntary compliance" before suspending or terminating funding, *see* 20 U.S.C. § 1682, *Gebser* held that the judicially implied private right of action similarly should not impose liability "without regard to the recipient's knowledge or its corrective actions upon receiving notice." *Id.* at 289. Monetary damages premised on constructive notice or *respondeat superior* for sexual harassment, the Court held in *Gebser*, would entail a risk that "the recipient of funds was unaware of the discrimination." *Id.* at 287. Rather,

> in cases like this one *that do not involve official policy of the recipient entity*, . . . a damages remedy will not lie under Title IX unless an official who . . . has authority to address the alleged discrimination and to institute corrective measures . . . has actual knowledge of discrimination . . . and fails adequately to respond.

*Id.* at 290 (emphasis added).

   **[7]** Critically for present purposes, *Gebser* does not make pre-litigation notice of an alleged violation a prerequisite to recovery in every Title IX case, or even in every sexual harassment case. Proof of actual notice is required only when the alleged Title IX violation consists of an institution's deliberate indifference to acts that "do not involve official policy of the recipient entity." *Id*. In sexual harassment cases, it is the deliberate failure to curtail known harassment, rather than the harassment itself, that constitutes the intentional Title IX violation.[13] *See Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 641 (1999) (holding that *Gebser* permits the plaintiff "to hold the Board liable for its *own* decision to remain

---

[13]The harassment itself may be actionable under state law or 42 U.S.C. § 1983. *Gebser*, 524 U.S. at 292.

idle in the face of known student-on-student harassment in its schools."). The Tenth Circuit has held that a corollary of this principle is that where the official policy is one of deliberate indifference to a known overall risk of sexual harassment, notice of a particular harassment situation and an opportunity to cure it are not predicates for liability. *See Simpson v. Univ. of Colo. Boulder*, 500 F.3d 1170 (10th Cir. 2007).[14]

[8] Consistent with the reasoning underlying *Gebser*, the Supreme Court has made clear that no notice requirement is applicable to Title IX claims that rest on an affirmative institutional decision. *Jackson v. Birmingham Board of Education*, 544 U.S. 167 (2005), held that a high school athletics coach fired in retaliation for complaining about discrimination in athletics funding had a private right of action under Title IX. The Court held that no pre-litigation notice is required in the retaliation context. In *Gebser* and *Davis*, the Court stated, "we emphasized that [the notice] limitation on private damages actions is not a bar to liability where a funding recipient intentionally violates the statute." *Id.* at 182 (quotation omitted). As retaliation is "easily attributable to the funding recipient and it is always — by definition — intentional," *id.*, the Court allowed Jackson's retaliation claim to proceed without regard to whether adequate pre-litigation notice and opportunity to cure the violation had been provided.

---

[14]*Simpson* concerned two female University of Colorado (CU) students sexually assaulted by football players and high school football recruits. The Tenth Circuit held that *Gebser*'s notice standard did not apply. The record supported the finding that the head football coach was aware of "the serious risk of sexual . . . assault during college-football recruiting efforts [and] that such assaults had indeed occurred during CU recruiting visits," *Simpson*, 500 F.3d at 1184, and that, although the Boulder District Attorney's office had recommended a policy to curb such assaults after a previous incident involving recruits, the policy was not followed and CU continued to sponsor an "unsupervised player-host program to show high-school recruits 'a good time.' " *Id.* The court held this sequence of events satisfied the "official policy" element of *Gebser* and that a woman assaulted thereafter need provide no separate notice and opportunity to cure before filing suit.

**[9]** Universities' decisions with respect to athletics are even more "easily attributable to the funding recipient and . . . always — by definition — intentional," *id.* at 183, than the retaliation in *Jackson*. Institutions, not individual actors, decide how to allocate resources between male and female athletic teams. Decisions to create or eliminate teams or to add or decrease roster slots for male or female athletes are official decisions, not practices by individual students or staff. Athletic programs that fail effectively to accommodate students of both sexes thus represent "official policy of the recipient entity" and so are not covered by *Gebser*'s notice requirement. *Gebser*, 524 U.S. at 290.

Moreover, a judicially imposed notice requirement would be superfluous in light of universities' ongoing obligations to certify compliance with Title IX's athletics requirements and to track athletics gender equity data. OCR regulations require funding recipients to evaluate their policies and certify, as a condition for receiving funds, that they are "tak[ing] whatever remedial action is necessary . . . to eliminate . . . discrimination." 34 C.F.R. § 106.4; *see also id.* § 106.3. UCD and other funding recipients therefore have an affirmative obligation to ensure compliance with at least one prong of the three-part effective accommodation test.

The Equity in Athletics Disclosure Act (EADA) further requires federally funded universities to report to the Department of Education and make available to students the number of undergraduates and athletes, broken down by sex, as well as sex-segregated data on operating expenses, coach salaries, athletic scholarships, recruiting expenditures, and revenues. 20 U.S.C. § 1092(g). UCD's EADA reports contain ample data demonstrating that it could not satisfy the substantial proportionality option and that the trend of increasing female athletic participation reversed after 2001, indicating that UCD may not have had a continuing practice of program expansion. Thus, where the alleged harm is unequal provision of athletic opportunity, the notice requirement would not supply univer-

sities with information of which they are legitimately unaware. *See Gebser*, 524 U.S. at 289.

**[10]** We conclude for these reasons that pre-litigation notice and opportunity to cure is not necessary in cases alleging unequal provision of athletic opportunities in violation of Title IX. Applying the notice requirement to institutional decisions would contravene the clear language of *Gebser* and its progeny. It would also be inconsistent with funding recipients' affirmative obligations to provide nondiscriminatory athletic participation opportunities and continually to assess and certify compliance with Title IX.

The Fifth Circuit has reached the same conclusion we do, holding that

> the requirement in the sexual harassment cases — that the academic institution have actual knowledge of the sexual harassment — is not applicable for purposes of determining whether an academic institution intentionally discriminated on the basis of sex by denying females equal athletic opportunity . . . . In the instant case, it is the institution itself that is discriminating.

*Pederson*, 213 F.3d at 882. The Eighth Circuit, the only other circuit to address the issue, has assumed, without any analysis, that *Gebser*'s notice requirement applies equally to Title IX cases where plaintiffs allege discrimination in the administration of an athletic program. *Grandson v. Univ. of Minn,*, 272 F.3d 568, 575 (8th Cir. 2001). But the plaintiffs in *Grandson* did not argue otherwise, *id.*, and the Eighth Circuit reached the merits of a later Title IX athletics case without mentioning *Grandson*, *Gebser*, or the notice requirement. *See Chalenor*, 291 F.3d 1042. It is therefore far from clear that *Grandson* is controlling even in the Eighth Circuit. If it is, then the circuits are already split on the issue, and we find the Fifth Circuit's holding (and that of the Tenth Circuit in *Simp-*

*son*, on a different but related issue) the more persuasive, for reasons already surveyed.

**[11]** We therefore join the Fifth Circuit in holding that *Gebser*'s notice requirement is inapplicable to cases alleging that a funding recipient has failed effectively to accommodate women's interest in athletics. The district court's decision granting summary judgment on that basis is reversed.

UCD also moved for summary judgment on the grounds that the record demonstrated "a history and continuing practice of program expansion" for women that satisfied Option Two of the three-part test. Although the district court granted summary judgment on the notice grounds discussed above, UCD contends that we could, alternatively, affirm the district court's decision on the merits. *See Atel Fin. Corp. v. Quaker Coal Co.*, 321 F.3d 924, 926 (9th Cir. 2003). That is so, but only if, viewing the evidence in the light most favorable to the students, there are no genuine issues of material fact concerning UCD's compliance with Option Two. *See, e.g.*, *Becerril v. Pima County Assessor's Office*, 587 F.3d 1162, 1163 (9th Cir. 2009). On the record before us we cannot affirm on this alternative ground.

**[12]** In assessing compliance with Option Two, we must, under the Clarification, focus on both the institution's record of adding female participation opportunities and its current "plan of program expansion that is demonstrably responsive to the developing interests and abilities" of women. "History" and "continuing practice" thus constitute two separate inquiries. We conclude that the undisputed facts fall short of demonstrating UCD's compliance with either facet of Option Two.

**[13]** The Clarification specifies the following factors as evidence of an institution's history of program expansion:

> [A]n institution's record of adding intercollegiate teams, or upgrading teams to intercollegiate status,

for [women]; an institution's record of increasing the number of participants in intercollegiate athletics who are [women]; and an institution's affirmative responses to requests by students or others for addition or elevation of sports.

The Option Two analysis focuses primarily, but not exclusively, on increasing the number of women's athletic opportunities rather than increasing the number of women's teams. "OCR will assess whether past actions of the institution have expanded *participation opportunities* for the underrepresented sex . . ." (emphasis added).

UCD had seven women's teams in 1970 and added another in 1974, thereby increasing the number of female varsity participation opportunities. The record indicates that UCD did not further expand participation opportunities for women until 1996. The 1991 Report of the UCD Title IX Review Committee (Report) indicated that UCD did not comprehensively review its compliance with Title IX between 1976 and 1991. The Report also stated that since 1976, UCD had added two women's sports (soccer and cross country track) but dropped two (golf and field hockey).[15] The Report concluded that UCD's record "cannot be termed a *demonstrably responsive* process of program expansion . . . particularly when female participation relative to male participation has been decreasing over the past three years." Internal UCD memoranda from directors of the athletics program suggest that the numerical participation gap continued to grow over the next two years.[16]

---

[15]UCD does not dispute that it eliminated field hockey but denies that it eliminated a women's golf team, asserting that UCD "attempted" to start a women's golf team in the 1970s that "never got off the ground." Drawing all reasonable inferences in favor of the plaintiffs, as we must, we credit UCD's internal report as accurately describing the elimination of a women's golf team.

[16]In 1992 an associate athletic director warned of a "backward slide in compliance," and in 1993 UCD's acting athletic director noted that "the ratio of women participating has decreased slightly in recent years."

In 1995, UCD decided to add three women's varsity teams. The university reviewed proposals from five women's club teams and elevated water polo, crew and lacrosse to varsity status. When the three new teams began competing the following year, the number of female athletes rose from 211 to 348, with the difference between female enrollment and female varsity participation opportunities dropping from twenty percent to eleven percent.[17]

UCD represents that it created another women's varsity team, indoor track, in 1999. There is some dispute as to whether indoor track was added as an independent women's varsity team or merely extended the track season for the existing female track team. The record indicates that "adding" the team was contingent on the fact that it could be accomplished without awarding additional grants-in-aid to student athletes or otherwise affecting UCD's athletics budget, because all the students who would be participating in indoor track were already members of the outdoor track team. With or without an additional female track team, the number of participation opportunities for female athletes continued to rise, so the dispute over how to characterize the addition of an indoor female track season does not matter. Indeed, in the 1999-2000 school year, women varsity athletes at UCD reached a historic high in both total numbers and proportion of female athletes to enrolled women students.

Two years later, however, the number of female participation opportunities had fallen by 17%, even as the number of women enrolled at the university had grown by 19%. The number of female participation opportunities fluctuated thereafter, but never regained the apex it reached in 2000. There were four varsity participation opportunities for every hundred female students in 2000, but only three in 2006.

---

[17]Again, "the number of female athletes" may include athletes who are counted more than once by virtue of participating in more than one sport.

**[14]** In sum, UCD expanded varsity opportunities for women only between 1996 and 2000. UCD's elimination of women from the varsity wrestling team thus took place in the context of an overall contraction of female athletic participation opportunities that began in 2000.[18] UCD's post-2000 strategy for sports equality between the sexes appears to have consisted of reducing varsity athletics overall, and in the process reducing men's participation opportunities more than women's participation opportunities by using "roster management" to limit the size of men's teams. The Clarification explicitly precludes considering such reductions as evidencing program expansion:

> OCR will not find a history and continuing practice of program expansion where an institution increases the proportional participation opportunities for [women] by reducing opportunities for [men] alone or by reducing participation opportunities for [men] to a proportionately greater degree than for [women]. . . . [Option Two] considers an institution's good faith remedial efforts through actual program expansion. . . . Cuts in the program for [women], even when coupled with cuts in the program for [men],

---

[18]As noted, *supra* note 2, the plaintiffs have submitted sufficient facts showing the existence of female varsity wrestling opportunities to survive summary judgment. UCD's subsequent decision to permit women to compete against men for a slot on the team does not affect our analysis. By requiring women to prevail against men, the university changed the conditions under which women could participate in varsity wrestling in a manner that foreseeably precluded their future participation.

UCD's contention that it "ha[d] not declared wrestling to be a contact sport" does not advance its position. First, wrestling *is* a contact sport under OCR regulations. 34 C.F.R. § 106.41(b). While women must be permitted to try out for all-male teams if there is no women's team in that sport, this requirement is waived for contact sports. *Id.* But the contact-sport "exemption did not give [UCD] license to discriminate against [the plaintiffs] because of their sex once [UCD] decided to allow [them] to join the team." *Mercer v. Duke Univ.*, 401 F.3d 199, 202 (4th Cir. 2005) (citation omitted).

cannot be considered remedial because they burden members of the sex already disadvantaged by the present program.

**[15]** An institution that has eliminated some participation opportunities for women can still satisfy Option Two if the elimination is offset by a strong history of program expansion. In UCD's case, however, the elimination of women's wrestling opportunities occurred in the context of a women's athletics program that was, at best, stagnant. We therefore hold that UCD has not had a history of program expansion for women and so did not satisfy Option Two through such a history.

The 1996 Clarification lists two factors that may indicate a continuing practice of program expansion:

> [A]n institution's current implementation of a non-discriminatory policy or procedure for requesting the addition of sports (including the elevation of club or intramural teams) and the effective communication of the policy or procedure to students; and an institution's current implementation of a plan of program expansion that is responsive to developing interests and abilities.

The record contains undisputed evidence that UCD has a procedure for requesting additional varsity sports and effectively communicates that procedure to students. According to the procedure distributed to students, the "primary factor" in UCD's evaluation of proposals to create new varsity teams is the "[o]verall impact on intercollegiate program gender equity." In 2003, UCD received detailed applications from members of four women's club sports (bowling, horse polo, field hockey, and rugby) seeking elevation to varsity status. These

applications indicate that students are aware of the opportunity to request new varsity athletic opportunities.[19]

The 2003 application was the field hockey club team's second attempt to regain varsity status. An earlier application was rejected in 1995. At that time, the Title IX Advisory Committee advocated elevating lacrosse rather than field hockey to varsity status but noted that field hockey had "developed strong interest from students" and was "a relatively strong NCAA sport," with three Division I teams competing at nearby universities. The committee recommended that "[s]hould gender equity not be achieved by the addition of the three sports proposed, and funding be available in the future, field hockey would be considered a prime candidate for addition to the ICA program in the future."

When field hockey club players applied for varsity status in 2003, however, their application was again denied. In fact, UCD rejected all four club team applications, even though all applicants were evaluated as "successful" and "active" club teams with "a long tradition of participation." Instead, UCD decided to create a women's golf team at the behest of the men's golf coach, even though no women attending UCD were interested enough in golf to participate at the club level or to request varsity status.

UCD contends that the fact that golf was proposed by the men's golf coach absent any demonstrated interest by female students is irrelevant. We disagree. A funding recipient can only satisfy Option Two by showing an expansion of participation opportunities that is "demonstrably responsive to [women's] developing interests and abilities . . . includ[ing]

---

[19]UCD points to its Title IX Compliance Officer and grievance procedure as evidence of a practice of program expansion. As both are required by OCR regulations, 34 C.F.R. § 106.8, and neither affects the number of female athletes or teams, they do not indicate program expansion for purposes of Option Two.

interests that already exist at the institution." Universities are free to consider applications from individuals other than students, and it is appropriate to evaluate interest at the high school level as well as among current UCD students. UCD has failed to establish, however, that the choice of golf was "demonstrably responsive" to the "developing interests and abilities" of either current or prospective female students.

The Clarification's examples of Option Two compliance all describe institutions that have added women's varsity teams based on requests from current club teams; questionnaires assessing interest among current and incoming female students; or survey data that shows "a significant increase in high school participation in that sport" or identifies the new sport as "emerging" or "among the most popular sports played by women" in the relevant region. UCD does not contend that any current or incoming students expressed interest in golf, and points to no surveys or other data demonstrating that golf is a popular or emerging sport among high school girls, either regionally or nationally.

UCD's observation that golf is offered at 639 high schools and 27 community colleges in California does not indicate that golf's popularity or growing presence compared to other sports was a significant factor in its selection.[20] UCD also noted, for example, that 1,646 high schools in the country, including Davis High School, sponsor field hockey; that "[r]ugby is an emerging sport for women within the NCAA" and was offered at Davis High School; and that "[t]here is growing interest [in bowling] at the community college and

---

[20]Defendant Warzecka chose to create a varsity golf team in part because the Big West Conference requires participating schools to add conference-sponsored sports, of which golf is one, before adding other sports, and because golf could be added at minimal expense, thanks to a local country club's willingness to provide a course for UCD athletes to practice and compete. While athletic conference rules and cost are, of course, legitimate factors in sport selection, neither takes precedence over the requirements of Title IX.

high school level in the state of California." There is no evidence that UCD evaluated golf as more popular or "emerging" than these other sports for purposes of meeting the interests of future students.

Moreover, UCD's selection of golf, which added only seven participation opportunities for women, was at odds with its own stated priority of taking a significant step toward overall gender equity. Elevating horse polo, rugby or field hockey would have added far more female varsity athletes.[21]

We recognize that budgetary constraints often prevent universities from creating new teams and adding varsity slots. But "Title IX does not require that a school pour ever-increasing sums into its athletic establishment." *Cohen v. Brown Univ.*, 991 F.2d at 898-99 n.15. Universities may achieve compliance by reducing men's athletic slots until participation rates become substantially proportionate to the undergraduate population. *Id.*; *Neal*, 198 F.3d at 771; *Kelley*, 35 F.3d at 270; *Roberts*, 998 F.2d at 830. They may not, however, maintain varsity teams for male students while denying female students comparable "opportunities to enjoy the thrill of victory, the agony of defeat, and the many tangible benefits that flow from just being given a chance to participate in intercollegiate athletics." *Neal*, 198 F.3d at 773.

**[16]** UCD took a significant step towards Title IX compliance by adding three women's teams in 1996, but Option Two requires more than a single step. It requires evidence of continuous progress toward the mandate of gender equality that Title IX has imposed on funding recipients for the past thirty years. The record before us does not contain undisputed facts showing a history and continuing practice of program expansion that is responsive to women's interests.

---

[21]UCD's review committee estimated that field hockey would add 22 female athletes; horse polo, 35; rugby, 30 to 40. Bowling would have added 12 to 15.

**[17]** We conclude that the grant of summary judgment to UCD cannot be affirmed on the alternative merits ground that UCD complies with Title IX's requirement of providing equal athletic opportunities to students of both sexes.

The students also sue under 42 U.S.C. § 1983, alleging that UCD violates the Equal Protection Clause by maintaining an athletics program that discriminates on the basis of gender. The district court dismissed the claim because it determined that "Title IX's enforcement scheme is sufficiently comprehensive to . . . demonstrate that Congress intended to preclude § 1983 claims when it enacted this statute."

**[18]** *Fitzgerald v. Barnstable School Committee*, 129 S. Ct. 788 (2009), decided after the district court dismissed the students' claims, held, to the contrary, that Title IX does not bar § 1983 suits to enforce rights under the Equal Protection Clause. As in *Fitzgerald,* the plaintiffs here invoke § 1983 to seek damages for violations of constitutional rights. *See id.* at 796-97 (explaining distinctions between the rights created by Title IX and those afforded by the Equal Protection Clause).

The defendants concede that the district court ruling does not survive *Fitzgerald* but urge us to affirm dismissal of the § 1983 claim on other grounds. We decline to do so, for reasons we now explain.

UCD first contends that the § 1983 claim for damages is precluded by the statute of limitations and that the district court did not address this argument. In fact, the district court considered and rejected the statute of limitations defense as to both the Title IX effective accommodation and § 1983 equal protection claims in response to UCD's original motion to dismiss. The court held that because the students claimed that they were "currently being subjected to defendants' allegedly sex discriminatory practices . . . their claims accrue each and every day they are denied equal access to athletic participation."

**[19]** The district court was quite correct. Section 1983 "is presumptively available to remedy a state's ongoing violation of federal law." *AlohaCare v. Haw. Dep't. of Human Servs.*, 572 F.3d 740, 745 (9th Cir. 2009) (quotation omitted). A plaintiff has adequately pled an ongoing claim if she can "show a systematic policy or practice that operated, in part, within the limitations period — a systematic violation." *Douglas v. Cal. Dep't. of Youth Auth.*, 271 F.3d 812, 822 (9th Cir. 2001) (quotation omitted); *see also Gutowsky v. County of Placer*, 108 F.3d 256, 259 (9th Cir. 1997) (holding plaintiff's § 1983 claims timely because she alleged "widespread policy and practices of discrimination [that] continued every day of her employment, including days that fall within the limitation period").[22] A university's ongoing and intentional failure to provide equal athletic opportunities for women is a systemic violation. As the plaintiffs were students and therefore subject to the policy that allegedly discriminated on the basis of sex at the time they filed their complaint, their § 1983 claim is not time-barred.

**[20]** UCD next urges this court to conclude that the § 1983 claim against the individual defendants is precluded by the doctrine of qualified immunity. The defendants, however, did not raise a qualified immunity defense in any of their dispositive motions before the district court.[23] Our discretion to affirm on grounds other than those relied on by the district court extends to issues raised in a manner providing the district court an opportunity to rule on it. *See Proctor v. Vishay Intertechnology, Inc.*, 584 F.3d 1208, 1226 (9th Cir. 2009); *Washington v. Confederated Bands and Tribes of Yakima*

---

[22]*Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002), held that each "[d]iscrete act[ ] such as termination, failure to promote, denial of transfer or refusal to hire . . . constitutes a separate actionable 'unlawful . . . practice' " for the purposes of triggering the statute of limitations period in a Title VII case. *Morgan* left undisturbed our case law governing continuing systemic violations.

[23]UCD raised a qualified immunity defense in its answer to the students' complaint but never litigated it thereafter.

*Indian Nation*, 439 U.S. 463, 478 n.20 (1979) ("[T]he prevailing party . . . was of course free to defend its judgment on any ground *properly raised below* whether or not that ground was relied upon, rejected, or even considered by the District Court. . . .") (emphasis added). As the district court has had no opportunity to rule on the individual defendants' qualified immunity defense, we will not affirm on that basis. The dismissal of the students' § 1983 claim is therefore reversed.

### CONCLUSION

**[21]** For the foregoing reasons, the plaintiffs' motion to amend their complaint is dismissed as moot. The district court's grant of summary judgment to the defendants on the Title IX claim is reversed. The district court's order dismissing the equal protection § 1983 claim is also reversed, and the case is remanded for further proceedings consistent with this opinion.